WILLIAM F. KING *vs.* ROBERT F. DRISCOLL & others.[1]

Middlesex. April 4, 1994. - August 11, 1994.

Present: LIACOS, C.J., ABRAMS, NOLAN, LYNCH, & GREANEY, JJ.

*Employment*, Termination. *Contract*, Employment. *Corporation*, Stock-holder's derivative suit, Stockholder. *Public Policy. Unlawful Interfer-ence. Malice. Practice, Civil*, Attorney's fees.

Discussion of cases involving the issue whether a retaliatory discharge of an at-will employee violates public policy. [581-583]

In a civil action in which an at-will employee claimed he was wrongfully terminated in retaliation for his participation as a shareholder in a de-rivative action against the employer, no considerations of public policy giving shareholders a right to seek redress for harms to a corporation, arising in the context of a conflict over the corporation's internal affairs, rose to the level of importance required to justify an exception to the general rule regarding termination of at-will employees. [583-585]

In a civil action in which an employee and shareholder of a closely held corporation claimed that the other shareholders breached the duty of utmost good faith and loyalty owed to him as a shareholder, the judge correctly concluded that the conduct of the defendants which caused the plaintiff to be terminated as an employee and, as a result, caused his stock to be repurchased constituted a breach of that duty. [585-587]

In a civil action in which the plaintiff claimed that the defendants inten-tionally interfered with contractual relations, the evidence was insuffi-cient to support a finding in favor of the plaintiff where no improper motive for the defendants' conduct was shown. [587]

The judge in a civil action correctly concluded that an officer of a corpora-tion had been terminated without cause, under the corporation's by-laws. [587-588]

This court vacated an award of attorney's fees to a plaintiff in a civil ac-tion that was based on rulings of the trial judge that this court reversed. [588]

[1]Albert Marchant, Michael Martin, and F.S. Payne Co.

CIVIL ACTION commenced in the Superior Court Department on June 28, 1990.

The case was heard by *Vieri Guy Volterra*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Richard L. Neumeier* for the defendants.

*Morris M. Goldings* (*John F. Aylmer, Jr.*, with him) for the plaintiff.

*Stephen S. Ostrach*, for New England Legal Foundation, amicus curiae, submitted a brief.

LIACOS, C.J. The defendants, Robert F. Driscoll, Albert Marchant, Michael Martin, and F.S. Payne Co., appeal from that portion of a judgment of the Superior Court entered against them in the plaintiff's wrongful termination suit. The plaintiff filed a cross appeal from another part of that judgment. See p. 581 & note 5, *infra*. We granted the defendants' application for direct appellate review. The primary issue presented here is whether the public policy exception to the rule that at-will employees may be terminated at any time with or without cause includes termination in retaliation for an employee's participation in a shareholder derivative suit.[2]

We recount the facts, many of which are in dispute on appeal, as found by the trial judge sitting without a jury. See Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). Payne is a closely held Massachusetts corporation which focuses on services to the elevator industry. Until 1988, it manufactured elevators and related parts. From its origin until August, 1990, all the stock of Payne was held by a small number of shareholders and Payne's upper-level management positions were occupied by individuals owning relatively large amounts

---

[2]The plaintiff's complaint was in four counts. Count I alleged breach of the covenant of good faith and fair dealing implied in all employment contracts as well as wrongful termination in violation of public policy. Count II alleged intentional interference with contractual relations. Count III alleged breach of the duty of utmost good faith and loyalty owed by shareholders of a close corporation to one another. Count IV alleged that the termination was in violation of the by-laws of Payne.

of the corporation's stock. In August, 1990, Payne's stock was purchased by Northern Elevator of Toronto.

Beginning in 1954, employees of Payne who purchased Payne stock were required to enter into a "buy back" agreement which allowed Payne to repurchase the stock at the end of the employees' respective tenures at Payne. The language of the buy back agreement was ambiguous and thus Payne repurchased stock over time from departing employees at varying rates. The buy back agreement became the subject of the shareholder derivative suit relevant here. See *Dynan* v. *Fritz*, 400 Mass 230 (1987), *S.C.*, *Martin* v. *F.S. Payne Co.*, 409 Mass. 753 (1991). The plaintiff here was one of the plaintiffs in that suit.

During the relevant time period, Edward A. Fritz, Jr., was a director, shareholder and, at one time, president of Payne.[3] Driscoll was a director, shareholder, and the president of Payne when the incidents leading to this lawsuit took place. Martin was an assistant to Driscoll, a director of Payne, but not a shareholder. Marchant was a director, shareholder, and an employee of Payne. King began his employment with Payne in 1958 and received various promotions until 1982 when he was elected by the directors to be vice president of Payne's manufacturing division. He remained in that position until his termination in November 1987. King was a shareholder of Payne.

During the 1970's and 1980's, various power struggles transpired within Payne, mainly between Driscoll and Robert G. Dynan, another large shareholder and Payne's lead salesperson. After Fritz's retirement, the corporate infighting culminated with the ascension to the Payne presidency by Driscoll. Dynan had been a director but was not reelected in 1983. Around that time, Driscoll called for Dynan's retirement, but Dynan refused. Later, Dynan's business traveling was restricted by Driscoll and thus Dynan's effectiveness as a salesperson was diminished.

---

[3]Fritz is not a party to this appeal.

Both Dynan and Driscoll made overtures to King seeking his support in their "war." At one point, Driscoll suggested to King that King should be transferred to another division within Payne so that King could be groomed to succeed Driscoll as president. King, preferring to remain in the manufacturing division, declined. In the spring of 1984, Dynan asked King to join him in filing a derivative suit regarding the stock buy back plan, especially as it related to the buy back of Fritz's stock. King initially declined but later, concluding that the suit was in the best interests of Payne, joined as a party to the derivative action.

During 1980-1984, Payne's manufacturing division was profitable. During the pendency of the derivative action from 1985 through 1987, however, the division sustained increasing losses. The judge found that Driscoll's course of conduct during that time exhibited a purpose to undermine King's ability successfully to manage the manufacturing division and, thus, to make the division unprofitable. Among Driscoll's actions cited by the judge were charging the salaries of certain employees to the overhead of that division, halting a computer project designed to improve manufacturing efficiency, and restricting Dynan's business travel for sales purposes.

In 1986, Driscoll hired Martin as his assistant, and Martin contracted with a consulting firm to evaluate the manufacturing division. The judge found that, for various reasons including Martin's past relationship with members of the consulting firm, the firm's evaluation of the division was compromised. Although Martin resigned his employment with Payne early in 1987, he had been appointed a director and so his involvement with the corporation continued. In March, 1987, Rick Auth was hired by Driscoll as assistant to the treasurer. Auth previously had been affiliated with the accounting firm that performed services for Payne.

In June 1987, a "steering committee" was formed to investigate the performance of Payne's manufacturing division. The committee was chaired by Auth. Its members were Marchant, King, two Payne managers, and Paul Oberg of

the consulting firm. The majority of the committee ultimately suggested that new management was needed in the manufacturing division — that is, King should be terminated.

On November 13, 1987, at a meeting of the Payne board of directors attended by Driscoll, Martin, Marchant and Fritz, the directors voted to terminate King. Fritz abstained from this vote. At a meeting on November 30, 1987, Driscoll, in the presence of Martin, terminated King's employment. King contends that, at this meeting, Driscoll suggested that he would not be firing King if it were not for his participation in the derivative suit.

The Driscoll faction proffered several legitimate business reasons for terminating King. The group contended that King was ineffective as vice president of manufacturing and cited King's failure to prepare a five-year plan for manufacturing as requested by Driscoll,[4] the $250,000 loss sustained by the manufacturing division in 1986, the steering committee's recommendation, and the consulting firm's recommendation. The judge discussed and rejected each of these reasons. In addition, the judge made findings regarding the motives and conduct of Driscoll, Martin, Marchant, and Fritz which led him to his conclusion that the reasons asserted for King's termination were a pretext.

The judge concluded that, on his review of the totality of the evidence, King's termination did not have a legitimate business purpose. Instead, the judge found, King was terminated in retaliation for his participation in the derivative action. Acknowledging the general rule that, as an at-will employee, King could be terminated at any time with or without cause, the judge ruled that King's termination in retaliation

---

[4]The judge found that Driscoll's request for a five-year plan amounted to a request for the impossible because of Payne's inadequate computer system, King's lack of resources to complete the plan and King's other time-consuming responsibilities. The judge found that, if King had worked on preparing a written plan, the daily functioning of the manufacturing division would have suffered. The judge further found that Driscoll knew his request was unreasonable.

for participating in a derivative suit was covered by the public policy exception to the general rule. Thus, the judge concluded, King's termination was wrongful and actionable at law.

The judge also ruled that Payne, through the actions of Driscoll, Martin, and Marchant, breached the covenant of good faith and fair dealing implied in at-will employment contracts. As to King's claim of intentional interference with contractual relations, the judge concluded that Driscoll and Martin, but not Marchant, were liable for interfering with King's employment contract with Payne. In addition, the judge concluded that Driscoll and Marchant, as shareholders in a close corporation, breached the duty of utmost good faith and loyalty owed to King, another shareholder.

On King's claim that his termination violated an implied contract that he would be terminated only "for cause" and only after notice and a hearing as provided in Payne's by-laws, the judge ruled against King.[5] Payne had filed counterclaims against King for allegedly violating an implied covenant of good faith and fair dealing by his alleged failure to prevent and later account for a loss of inventory, his alleged premature installation and invoicing of a particular elevator project, and his alleged failure to rectify a problem with a certain type of elevator button used by Payne. The judge found in favor of King on these counterclaims.[6] The judge also awarded King attorney's fees.

1. *Wrongful termination claim.* The defendants argue that there was insufficient evidence on which the judge could have based his finding of wrongful termination, and that, in any case, there is no public policy which would prevent an employer from terminating an employee who participates in a shareholder derivative action. Because we agree with the defendants' second argument, we need not address the first. See

---

[5]It is from this ruling, and the judgment pursuant to it, that the plaintiff cross appeals.

[6]Neither party has raised on appeal the part of the judgment relating to the counterclaims.

*Wright* v. *Shriners Hosp. for Crippled Chidren*, 412 Mass. 469, 472 (1992) (whether retaliatory discharge violates public policy question of law for the judge).

As an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, we have recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy. *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 810-811 (1991) (wrongful termination where employee was terminated for cooperating with Customs officials in investigation of employer, even though employee was not required by law to cooperate) (noting, *id.* at 810, quoting *Smith-Pfeffer* v. *Superintendant of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149 [1989], that "redress is available for employees who are terminated 'for asserting a legally guaranteed right [e.g. filing workers' compensation claim]' "). *Hobson* v. *McLean Hosp. Corp.*, 402 Mass. 413, 416-417 (1988) (wrongful termination may be found where employee was terminated for adhering strictly to what law required). *De-Rose* v. *Putnam Management Co.*, 398 Mass. 205, 209-211 (1986) (termination wrongful where employee was terminated for refusing to testify falsely at trial, i.e., refusing to do what the law forbids). *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 306-307 (1982) (wrongful termination may be found where employee is terminated for refusing to provide information to employer where such request is serious or substantial interference with privacy). *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 668 n.6 (1981), *S.C.*, 391 Mass. 333 (1984).

This court consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would "convert the general rule . . . into a rule that requires just cause to terminate an at-will employee." *Smith-Pfeffer* v. *Superintendent of the Walter E. Fernald State Sch.*, *supra* at 150. See *Wright*, *supra* at 474 (where nurse reported internal problems to high-level officials within organization, reports were internal matter, which could not be basis for pub-

lic policy exception); *Smith-Pfeffer*, *supra* at 150-151 (where employee expressed disagreement with superior's management of school, even if to do so was appropriate, socially desirable conduct, termination was not wrongful because school management was an internal matter); *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555, 560-561 (1988) (termination of employee who reported false damage claims could not be wrongful because claims were an internal matter). See also *Mistishen* v. *Falcone Piano Co.*, 36 Mass. App. Ct. 243, 245-246 (1994) (discharge of employee who threatened to reveal employer's unfair and deceptive trade practices which were not a threat to public health or safety was not wrongful because the situation did not rise to the requisite level of public importance; it was an internal matter); *Yovino* v. *Fish*, 27 Mass. App. Ct. 442, 444-445 (1989) (termination of producer of radio program who permitted program which parodied and thus offended public officials was not wrongful because no issue of freedom of speech of employee was involved).

As the above cases demonstrate, the internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time with or without cause. In this case, the subject of the lawsuit, the price to be paid under the stock buy back program, was an internal company matter. The mere fact that a dissatisfied shareholder could litigate the matter in a court of the Commonwealth does not transform this into an external matter involving, as the plaintiff argues, public policy. Thus, assuming that King was terminated in retaliation for participation in the derivative action, we conclude that his termination did not violate any public policy.

General Laws c. 156B, § 46 (1992 ed.), conferred on King the right to participate in a derivative suit. While we often look to statutes to find pronouncements of public policy, see, e.g., *Federici* v. *Mansfield Credit Union*, 399 Mass. 592, 596-597 (1987); but see *Wright, supra* at 477-478 (Liacos, C.J., dissenting) (emphasizing separate common law sources

of public policy determinations), it is not necessarily true that the existence of a statute relating to a particular matter is by itself a pronouncement of public policy that will protect, in every instance, an employee from termination. Even a public policy, evidenced in a particular statute, which protects employees in some instances might not protect employees in all instances. See *Mistishen, supra.* The statute at issue may suggest a public policy in favor of allowing shareholders to seek redress for perceived harms to the corporation. This public policy, however, which relates to the financial well being of the corporation and, by extension, its shareholders, does not rise to the level of importance required to justify an exception to the general rule regarding termination of employees at will.

It may be true generally that the financial well being of a corporation affects the economy which in turn affects the well being of the citizenry, and that, therefore, shareholder derivative actions are appropriate and socially desirable conduct. Nevertheless, such a remote effect on the public, arising in the context of a conflict over internal policy matters, does not elevate King's participation in the lawsuit to protected activity. See *Mistishen, supra* at 246.

The fact that participation in a derivative suit is a right of a shareholder employee conferred by G. L. c. 156B, § 46, also does not change our conclusion. To date, we have acknowledged very few statutory rights the exercise of which would warrant invocation of the public policy exception. See *Flesner, supra* at 810. For the exercise of a statutory right to be worthy of protection in this area we believe that the statutory right must relate to or arise from the employee's status as an employee, not as a shareholder.[7] Cf. *Mello, supra* at 557 (rule of liability can be found where statute expresses Legislature's policy concerning employees' rights). The exer-

_____

[7]Of course, a statute itself may provide that an employer may not terminate an employee for exercising rights conferred by the statute, and in such a case, the common law public policy exception is not called into play. See *Mello, supra* at 555 (no common law remedy is needed where statute prescribes a remedy).

cise of the right to file a derivative action arose from King's status as a shareholder[8]; his termination as an employee resulting from the exercise of that right does not automatically entitle him to seek redress.[9]

2. *Breach of the duty of utmost good faith and loyalty owed to King as a shareholder.* Relying on *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 586-587 (1975), and *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 848 (1976), the judge concluded that Driscoll and Marchant breached the duty of utmost good faith and loyalty to King when they terminated King's employment with Payne.

---

[8]As we noted in note 2, *supra*, count I of the plaintiff's complaint alleged both wrongful termination in violation of public policy, and breach of the covenant of good faith and fair dealing implied in at-will employment contracts. See *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 101 (1977). Thus, count I was in two parts which were independent of each other. The judge's conclusions on each part of count I likewise were independent of each other. The defendants thoroughly argued on appeal their position as to the first part of count I, the public policy exception, but they did not argue the second part, the breach of the covenant described in *Fortune.* Thus, the issue of the breach of the covenant of good faith and fair dealing is not before us. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Our conclusion regarding the first part of count I does not affect the judge's findings on the second part.

The defendants argued their position as to count III regarding the duty owed to King as a fellow shareholder. This issue is not the same as the duty of good faith and fair dealing owed to King as an employee. In addition, the defendants argued that the evidence was insufficient to support a finding that King was terminated in retaliation for his participation in the derivative suit. Again, this argument does not relate to the issue of the duty of good faith and fair dealing owed to King as an employee.

The defendants' purported argument regarding certain findings alleged to be clearly erroneous, was set forth by making reference in their brief to posttrial motions, and does not rise to the level of appellate argument. Mass. R. A. P. 16 (a) (4). See *Wellfleet* v. *Glaze*, 403 Mass. 79, 80 n.2 (1988).

On remand, the judge should recalculate damages, if any, attributable to the breach of the covenant of good faith and fair dealing owed to King as an employee. See *Fortune, supra* at 104-105; *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 672 (1981), *S.C.*, 391 Mass. 333 (1984).

[9]We acknowledge the assistance provided to us on this issue by the amicus brief of the New England Legal Foundation.

The defendants argue for reversal of this conclusion. In support thereof they offer the case of *Evangelista* v. *Holland,* 27 Mass. App. Ct. 244 (1989). *Evangelista, supra* at 248-249, cites to *Donahue, supra* at 598 n.24, for the proposition, "Questions of good faith and loyalty do not arise when all the stockholders in advance enter into an agreement for the purchase of stock of a withdrawing or deceased stockholder." In both the *Donahue* and *Evangelista* cases, however, the controversies themselves arose from repurchase transactions of the stock of certain shareholders. *Donahue, supra* at 579. *Evangelista, supra* at 245-246. Thus, the courts deciding those cases were examining the duties of good faith and loyalty surrounding the repurchase transactions alone. Accordingly in *Evangelista,* where there was a valid repurchase agreement previously executed and there was no indication that, at the time of the execution of the agreement, the parties failed in their duties of good faith and loyalty, the court was warranted in stating that "[q]uestions of good faith and loyalty do not arise when all the stockholders in advance enter into an agreement for the purchase of stock . . . ." *Id.* at 248-249. *Evangelista* does not stand for the proposition that the existence of a buy back agreement completely relieves shareholders of the high duty owed to one another in all dealings among them.

In this case, contrary to the facts of *Donahue* and *Evangelista,* the allegations of breach of the duty of utmost good faith and loyalty arose from the conduct of fellow shareholders Driscoll and Marchant during the whole series of events leading up to and including the termination of the plaintiff. The plaintiff did not aver that the terms of the repurchase constituted a breach of the duty, but in essence argued that the conduct of the defendants which caused him to be terminated and, as a result, caused his stock to be repurchased constituted a breach of that duty. The judge agreed.

The only legal ground asserted by the defendants for reversal on this issue was the quoted language from *Evangelista, supra.* As we have discussed above, however, that case is not persuasive here. Factually, the defendants have not

met their burden of showing that the findings of the judge supporting his conclusion in this matter were clearly erroneous. See Mass. R. Civ. P. 52 (a); *First Pa. Mortgage & Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-622 (1985). The mere reference in the defendants' brief to pretrial motions, without more, will not suffice. See *Wellfleet* v. *Glaze*, 403 Mass. 79, 80 n.2 (1988). We affirm this part of the judgment.

3. *Intentional interference with contractual relations.* The defendants contend that the evidence at trial was insufficient to support a finding of improper motive, which is an element of the plaintiff's claim for intentional interference with contractual relations. The judge concluded that "Driscoll and Martin fired King out of ill-will, spite, and greed; *intending to secure more power and monetary benefits for themselves*" (emphasis supplied).

One of the elements of intentional interference with contractual relations is improper motive or means on the part of the defendant. *Wright, supra* at 476. We have said that the improper motive or malevolence required is "actual malice," *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993), citing *Gram, supra* at 663, "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Wright, supra*, quoting *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 433 (1987). The motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement. *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 817 (1990). Similarly, personal dislike will not warrant an inference of the requisite ill will. *Boothby, supra* at 487.

Here, the judge identified only the motives of personal and financial gain. We perceive no reason why our conclusion in *United Truck Leasing Corp., supra*, should not be applied to this case. Accordingly, the holding of the judge on this claim must be reversed.

4. *Violation of Payne's by-laws regarding termination for cause.* The plaintiff claims the judge erred when he found for the defendants on the plaintiff's claim that Payne violated its

by-laws by dismissing him without notice and a hearing. The relevant provision of the by-laws provides as follows:

"The board of directors, with or without cause, may remove any officer of the Company, at any time, by majority vote. If a removal for cause, he must be given reasonable notice and an opportunity to be heard before the body proposing to remove him. Removal of the duly elected or appointed officer shall be by a majority vote of the Board of Directors."

The judge concluded that Payne terminated King "without cause," and any discussion of a "for cause" termination was actually an attempt by Payne to establish, in response to King's claim that his discharge was retaliatory, a prima facie showing of a legitimate business reason for the discharge. The judge also found that no condition had been implied in the terms of King's employment that he would be terminated only for cause.

We agree with the judge. Payne most likely would not have advanced a reason for King's termination but for King's claim of termination in violation of public policy. Thus, the judge did not err in concluding that, for the purpose of the by-law provision, King was terminated without cause. King cannot bring himself within the scope of the by-law merely by filing suit thereby requiring Payne to respond. Cf. *Cort*, *supra* at 305-306 (where no reason need be given, employer will not be penalized for giving false reason).

5. *Award of attorney's fees.* The judge awarded attorney's fees to the plaintiff. Pursuant to an order of a single justice of the Appeals Court resulting from the defendants' appeal from the award of fees, the judge explained that he awarded fees based on his finding in favor of the plaintiff on the claims of wrongful termination in violation of public policy and intentional interference with contractual relations. Since we reverse the judge's rulings on those claims, we vacate the award of attorney's fees based on those rulings.

6. *Conclusion.* The portion of the judgment of the Superior Court finding the defendants liable for wrongful termination in violation of public policy is reversed. The portion of the judgment of the Superior Court finding the defendants liable for intentional interference with contractual relations also is reversed. The award of attorney's fees is vacated. The remainder of the judgment is affirmed. The case is remanded for further proceedings, including recalculation of damages, in accordance with this opinion.

*So ordered.*