**Kevin N. FLYNN and Randy Wolfson**

v.

**Thomas MENINO, City of Boston (Boston Community Centers), and Evelyn Riesenberg.**

**Civil Action No. 94–11743–RGS.**

United States District Court,
D. Massachusetts.

Nov. 5, 1996.

Mark S. Bourbeau, Boston, MA, for Kevin N. Flynn, Wolfson Randy.

Susan M. Weise, City of Boston Law Department, Boston, MA, Mary Jo Harris, Kopelman & Paige, P.C., Boston, MA, for City of Boston, Thomas Menino, and Evelyn Riesenberg.

## MEMORANDUM AND DECISION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiffs Kevin Flynn and Randy Wolfson are suing the City of Boston, its Mayor, Thomas Menino,[1] and Evelyn Riesenberg, the Executive Director of Boston Community Centers (BCC), a City agency. Flynn and Wolfson allege that they were fired from senior positions at BCC for want of dedication to the Mayor's political interests. Flynn and Wolfson claim that defendants violated their First Amendment rights to free speech and association. They seek declaratory and injunctive relief, money damages, and attorney's fees.

Before the court are defendants' motions for summary judgment on the surviving counts of the Amended Complaint.[2] The defendants claim, in individual motions, that the plaintiffs are unable to demonstrate that protected speech played a determining part in their terminations or that their jobs were protected by the First Amendment.

## FACTS

The material facts, construed in the light most flattering to the plaintiffs, are these. Flynn and Wolfson were senior employees of BCC. Flynn served as the Associate Director for Administration and Finance. Flynn's responsibilities included oversight of BCC financial and personnel matters. Wolfson served as Associate Director of Field Services. Wolfson oversaw the operations of

---

1. Mayor Menino is named in both his official and personal capacities.

2. On December 4, 1994, Flynn and Wolfson filed an Amended Complaint consisting of the following counts: Count I—declaratory and injunctive relief under the First Amendment against the City of Boston and Mayor Menino; Count II—declaratory and injunctive relief under the First Amendment against Riesenberg; Count III—mandamus against all defendants; Count IV—42 U.S.C. § 1983, all defendants individually; Count V—M.G.L. c. 12, § 11*l*, all defendants individually; Count VI—wrongful termination, all defendants; and Count VII—intentional in-fliction of emotional distress, Riesenberg. After a hearing, the court dismissed Counts III and V of the Amended Complaint and denied the motion with respect to Counts I, II, IV, VI and VII. The court held that despite the larger remedies of 42 U.S.C. § 1983, plaintiffs might have a plausible argument that they were entitled to injunctive and declaratory relief, if not monetary damages, in an action brought directly under the First Amendment. In response, plaintiffs waived any claim for money damages under Counts I and II. Later, the parties stipulated to dismissal with prejudice of Count VII of the Amended Complaint.

twenty community centers. Both Flynn and Wolfson reported directly to BCC's Executive Director. Flynn and Wolfson did not endorse or campaign for any candidate for Mayor during the 1993 mayoral campaign.

In January, 1994, after winning election as Mayor, Menino appointed Riesenberg, one of his special assistants, as Executive Director of BCC. Upon assuming her new duties, Riesenberg asked Wolfson to gather information on the political loyalties of BCC employees. Amended Complaint, ¶ 19; Wolfson Dep., at 238–241. Riesenberg also asked Flynn how she could fire the entire staff and replace them with her own or the Mayor's people.[3] Flynn Dep., at 231. One of Riesenberg's first acts as Executive Director was to hire Charles Clabaugh, a Menino precinct captain, as her Special Assistant. Riesenberg hired Clabaugh without requiring him to submit a resume or a City of Boston employment application. Riesenberg Dep. I, at 56–59.[4] Riesenberg became angry when Wolfson and an interview committee rejected an applicant for an athletic director's position backed by the Mayor. Wolfson Dep., at 152–157.[5] Riesenberg hired the candidate nonetheless, although for a position with less responsibility. Wolfson Dep., at 158. Wolfson states that she overheard Riesenberg order Clabaugh not to interview an applicant who might have supported one of the Mayor's opponents. Wolfson Dep., at 250–251.[6]

Shortly after Riesenberg arrived at BCC, Flynn and Wolfson briefed her on a sexual harassment complaint previously filed by a female employee against her supervisor. Wolfson Dep., at 326–327. According to Flynn, the alleged offender had served as a ward coordinator in Menino's mayoral campaign. Flynn Dep., at 173. Wolfson recommended that the complainant be supervised by someone else. According to Wolfson, Riesenberg replied that the "woman couldn't have [her] position if she couldn't be supervised by him" and "suggested that [she] be moved into a different position." Wolfson Dep., at 327–328. Plaintiffs told Riesenberg that the supervisor had failed to reveal on his employment application that he was on probation for selling drugs, and that Riesenberg's predecessor had not handled the case "appropriately." [7] Wolfson Dep., at 330. The plaintiffs also informed Riesenberg of an allegation that the same supervisor had been observed using drugs in a city vehicle, a matter they thought should be investigated. Riesenberg's response was "noncommittal." Wolfson Dep., at 331. Riesenberg suggested that Wolfson might have a "personality conflict" with the man. Id. Wolfson states that Riesenberg "effectively excluded her from [further] involvement in the matter." Plaintiff's Opposition at 8. Some time thereafter, Riesenberg relieved Flynn of oversight of sexual harassment matters.[8] Clabaugh as-

---

3. Riesenberg denies making either of these requests.

4. Plaintiffs do not claim to have voiced an objection to Riesenberg's decision to hire Clabaugh.

5. Wolfson and Flynn cite two other instances where Riesenberg either hired or offered a job to a person whom they deemed unqualified. See Flynn Dep., at 158–160; Wolfson Dep., at 246–250. Flynn acknowledges that he has no knowledge of the political affiliations of any of the persons Riesenberg hired. Flynn Dep., at 135, 138, 141. Nor does he know of any person rejected for employment because of their political affiliation. Flynn Dep., at 144–145. Wolfson identifies three persons whom she claims were hired because of their political affiliation. Wolfson Dep., at 171, 174, 182–183.

6. Wolfson did not raise an objection to Riesenberg's directive.

7. Plaintiffs acknowledge that the supervisor had been suspended for this infraction. Wolfson Dep., at 329.

8. Flynn did not voice any objection. Flynn Dep., at 172. In their Supplemental Memorandum, at 3, plaintiffs claim that in a second case that had been concluded before her arrival, Riesenberg, over plaintiffs' objections, modified the punishment recommended by the City's affirmative action office for a politically connected employee who had been accused of harassment by two women. There is nothing, however, in the record presented by the plaintiffs to support this claim. Flynn merely states that the two women were dissatisfied with the outcome. Flynn Dep., at 178. Compare Riesenberg Dep. II, at 21–22, cited by the plaintiffs, where Riesenberg states that she followed all of the steps that had been recommended by the City personnel department. Although it is unclear which incident is being discussed in the transcript, assuming it is this one, at most Riesenberg asked that one recommendation be modified to permit it to be carried

sumed Flynn's duties in this regard. Clabaugh Dep., at 148.

One month after Riesenberg's appointment, she ordered Flynn to process a pay raise for a union employee. Flynn objected on grounds that to do so would contravene the terms of a collective bargaining agreement. Flynn Dep., at 149–153. Flynn also objected to Riesenberg's decision to hire a second person on a federal grant when Flynn believed that only one was authorized. Flynn Dep., at 133.

In late July of 1994, Riesenberg gave both Flynn and Wolfson termination notices, citing plans to reorganize BCC. On August 12, 1994, the plaintiffs, through counsel, delivered a letter to Mayor Menino notifying him of Riesenberg's actions and demanding that he countermand their impending dismissal. The Mayor referred the letter to the City's Corporation Counsel, who, in a reply dated August 19, 1994, rejected the plaintiffs' demand. In his letter, the Corporation Counsel attributed plaintiffs' discharge to a "reorganization within the Boston Community Centers and an evaluation of their performance." The letter was, plaintiffs allege, a "cover-up" for the unconstitutional actions taken against them and an affirmation of the policy of the Mayor and the City "to make political service a condition of employment." Amended Complaint, ¶ 35. The plaintiffs were fired on August 19, 1994, and filed this lawsuit on August 30, 1994.

## DISCUSSION

Summary judgment is appropriate when, based upon pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Coop. Soc.*, 3 F.3d 495, 497 (1st Cir.1993). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). In considering the admissible evidence provided to the court, the non-moving party is indulged with all favorable inferences. *Oli-*

*ver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988).

## PART A

■ Counts I and II of the Amended Complaint are based on alleged violations of the First and Fourteenth Amendments to the United States Constitution. In these counts, plaintiffs seek declaratory and injunctive relief (specifically reinstatement to their jobs and a court declaration of their right to be free from retaliation for protected activity). The First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, prohibits the dismissal of a public employee based solely upon his or her refusal to give support to the political party in power, unless political affiliation is an appropriate requirement of the employee's job. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–2690, 49 L.Ed.2d 547 (1976). The First Amendment also enjoins the dismissal of a public employee in a non-policy making position solely because of his or her political affiliation or lack of political sponsorship. *Branti v. Finkel*, 445 U.S. 507, 516–517, 100 S.Ct. 1287, 1293–1294, 63 L.Ed.2d 574 (1980). See also *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (extending the *Elrod–Branti* rule to applicants for public employment). And finally, the First Amendment forbids the discharge of a public employee solely for the exercise of his or her right to criticize, publicly or privately, the policies of the party in power. *Perry v. Sindermann*, 408 U.S. 593, 597–598, 92 S.Ct. 2694, 2697–2698, 33 L.Ed.2d 570 (1972).

■ The plaintiffs, to prevail on these counts, must produce sufficient evidence of a direct or circumstantial nature that either partisanship or retaliation for protected speech (or both) was a substantial or motivating factor in their dismissals. See *Jirau–Bernal v. Agrait*, 37 F.3d 1, 3 (1st Cir.1994); *Anthony v. Sundlun*, 952 F.2d 603, 605 (1st Cir.1991). If plaintiffs surmount this threshold, the burden then shifts to defendants to

---

out by her Deputy Director, rather than the Associate Director in charge of the facility where the

offender was working. Riesenberg Dep. I, at 171–172.

prove by a preponderance of the evidence that plaintiffs either held positions for which partisan affiliation was an appropriate requirement, or that plaintiffs would have been dismissed in any event for permissible reasons. *Mt. Healthy City School District Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Wytrwal v. Saco School Bd.,* 70 F.3d 165, 170 (1st Cir.1995); *Acevedo–Diaz v. Aponte,* 1 F.3d 62, 66 (1st Cir.1993).[9]

■ As for the political affiliation contention, the partisan statements attributed by the plaintiffs to Riesenberg are sufficient for present purposes to support an inference that they were fired because they were perceived as insufficiently loyal to the Menino regime. Without conceding the ultimate point, defendants offer evidence that plaintiffs' positions in City government were at a sufficiently high level to make political loyalty a legitimate criterion of their tenure.[10]

■ Although fact-intensive, the determination whether a government position is "political" is a matter of law to be decided by the court. *Ortiz–Pinero v. Rivera–Arroyo,* 84 F.3d 7, 12 (1st Cir.1996). A common consideration is to ask whether an employee occupies a position of trust, although the answer to that question is not dispositive. "Under some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character.... In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1294.

■ In searching out the contours that define a "political post," we look to the substance of the duties inherent in an employee's position. *Ortiz–Pinero,* 84 F.3d at 12. We ask first whether the overall functions of the employee's department or agency involve "decisionmaking on issues where there is room for political disagreement on goals or their implementation? ... [T]he next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–242 (1st Cir.1986) (en banc). Some relevant factors in the policymaking determination include "relative pay, technical competence, power to control others, authority to speak in the name of policy-makers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders." Id. at 242 (quoting *Ecker v. Cohalan,* 542 F.Supp. 896, 901 (E.D.N.Y.1982)).[11]

Often dispositive is a plaintiff's own testimony regarding his or her actual job duties. *Jimenez Fuentes,* 807 F.2d at 244–245; *O'Connor v. Steeves,* 994 F.2d 905, 911 (1st Cir.1993). Plaintiffs describe BCC in their Amended Complaint as "an official agency of the City of Boston, composed of [forty one] community centers throughout the city, which implement recreational, educational, senior, child care, youth work and other community programs.... [T]he BCC has an approximate total of 400 employees and a total budget of some $15 Million." Amended Complaint, ¶ 6. Flynn served as BCC's Associate Director for Administration and Finance. His responsibilities included "over-

---

**9.** The same burdens apply to plaintiffs' claims under 42 U.S.C. § 1983 which are also based on the First and Fourteenth Amendments.

**10.** The City also maintains that plaintiffs would have been fired in any event as part of a plan to reorganize BCC. In support, the City offers the affidavits of Patricia Brainard and Janice Hamilton, Associate Directors of BCC and Menino supporters, who lost their jobs at BCC at the same time as did the plaintiffs. The City also offers the

deposition testimony of Ophelia Mencey, BCC's Personnel Director, that a consolidation of positions at BCC was undertaken by Riesenberg in the summer of 1994, and the testimony of Charles Clabaugh to the same effect.

**11.** *Jimenez Fuentes,* 807 F.2d at 241, includes a useful compilation of governmental positions that have been found subject to political dismissal.

sight of all finance and personnel functions within the BCC, preparation and implementation of the department budget, supervision of state, federal and private grant management, management of the agency's payroll and contract functions, providing fiscal, legal and personnel assistance to the non-profit corporate arms of the centers," and direct liaison to many City departments including the Law Department, Budget and Audit Departments, Management Information Systems, and Labor Relations, as well as to various state and federal agencies.[12] Amended Complaint, ¶ 10; Flynn Dep., at 41–49. Additionally, Flynn worked with the offices of the Massachusetts Attorney General and the Massachusetts Secretary of State in establishing local councils as non-profit entities.[13] Flynn also monitored BCC's Personnel Department in its handling of sexual harassment complaints. Amended Complaint, ¶ 29. Flynn reported to Riesenberg. Flynn Dep., at 37.

According to his testimony, Flynn performed duties at BCC that entailed policy-making, representational activities, ministerial duties, and personnel oversight. See *Jimenez Fuentes*, 807 F.2d at 244; *O'Connor*, 994 F.2d at 911 (1st Cir.1993). In reporting directly to BCC's Executive Director, and as a liaison to various City departments, Flynn was privy to confidential information. As an Associate Director with oversight of a $15 million plus budget and as the Executive Director's designee for hirings, purchasing and expenditures, Flynn proposed, established, and implemented City policy. Flynn frequently represented BCC and its affiliates in dealings with other City agencies, and departments, state and federal agencies, and private businesses and individuals. Flynn, in other words, played a sufficiently important role at BCC and within City government to make his position one for which political affiliation was an appropriate requirement. *Jimenez Fuentes*, 807 F.2d at 245.[14]

12. In describing his responsibilities for preparation of BCC's budget, Flynn testified that "the preparation of the budget is about a four-month project. It would require establishing a budget committee through local—the boards, working with the treasurer of the Citywide Board and a panel of usually a dozen people in the budget preparation. It would require working with the Mayor's office for the goals and objectives of the coming year. It would require briefings with the Budget Department, requiring input regarding the City Council hearings. It used to mean meeting with the chairman of the [Legislature's] Ways and Means Committee." Flynn Dep., at 52.

Flynn described his duties as liaison to the Law Department as "[i]n any event that there was a legal problem, such as an attorney calling, a suit being filed against the community centers, a 51A, any legal problem with the staff, I would assist the field staff or central office staff would come to me and explain the problem. At that point I would call the attorney who was assigned to our department, explain the situation, and then take the lead from the City's attorney on how to pursue it. Most of what I would do would be to gather information, make sure that things were properly documented, represent people from community centers to the Law Department, essentially bring them over. In the event that a court hearing was necessary, I would usually attend. If we had a case before the MCAD, I would be the person from Boston Community Schools to attend. With State Labor Relations if we had a problem, I would be the one to attend. If we had to go to court on a negligence suit, I would represent the depart-

ment I believe as the key person, as the keeper of records as well. If we had a particularly violent incident that resulted in a family or an organization suing the department, I would be the information gatherer and work with the City attorneys to represent the City in that case." Flynn Dep., at 42–43.

With regard to the Labor Relations Department, when the community schools' senior staff began to unionize, Flynn "was appointed the lead negotiator for the labor relations." Flynn Dep., at 44.

13. Flynn testified that as an Associate Director of the BCC, he assisted local non-profit organizations administratively and in raising independent funds, and oversaw all finance and personnel decisions. "Essentially if any transaction was going to be made either financially or through personnel, it would go to the comptroller, the grants manager, or the personnel director who worked for me. So essentially I would be the sign-off on all of their work. It would include the hiring of individuals, the purchasing of goods, the expenditures of funds." Flynn Dep., at 47–48.

14. After the close of discovery, and after defendants had filed their motions for summary judgment, plaintiffs attempted to file affidavits contradicting significant portions of their deposition testimony, particularly those portions elaborating on the responsibilities of their respective positions. The court has allowed defendants' motion to strike these affidavits. See *Colantuoni v.*

■ Wolfson served as BCC's Associate Director of Field Services. Wolfson's responsibilities included "overseeing the operations at twenty community centers, including recreation, aquatics, programming, personnel, and budgets, monitoring the various programs of the BCC for compliance with municipal, state and federal regulations, providing technical assistance to the non-profit corporate arms of the centers, writing of the operational and non-profit fiscal compliance manuals for the agency, and supervision of capital improvements, maintenance, and repairs." [15] Amended Complaint, ¶ 11. Wolfson also reported to Riesenberg. Wolfson Dep., at 60.

Wolfson, like Flynn, because of her reporting relationship, was privy to confidential information. While her duties were somewhat less broad than Flynn's, she had the greater interaction with the public. In that capacity, she had the authority to speak in the name of City policymakers. She handled matters that were "potentially subject to partisan political differences" and her job "involved at least a modicum of policymaking responsibility." *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1258, 1259 (1st Cir.1987). Her position, like Flynn's, was thus fairly subject to a political test.

### PART B

■ Flynn and Wolfson's second contention, that they were fired in retaliation for the exercise of their First Amendment right of free speech, requires separate analysis. A public employer may not, as a rule, dismiss an employee simply because it disapproves of what the employee says, either in public or in private. *Perry,* 408 U.S. at 597–598, 92 S.Ct. at 2697–2698. See also *Bd. of Cty. Com'rs., Wabaunsee County v. Umbehr,* — U.S. ——, ——, 116 S.Ct. 2342, 2352, 135 L.Ed.2d 843 (1996). Cf. *O'Hare Truck Service, Inc. v. City of Northlake,* — U.S. ——, ——, 116 S.Ct. 2353, 2361, 135 L.Ed.2d 874 (1996). The First Amendment rights of public employees are not, however, absolute. If they were, a public employee could confer tenure on himself by opportunistic denunciations of his employer's policies. Rather,

[g]overnment employees' First Amendment rights depend on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering [v. Board of Ed. of Township High School Dist. 205, Will Cty.* ], 391 U.S. [563, 568 [88 S.Ct. 1731, 1734–1735, 20 L.Ed.2d 811] (1968) ]. In striking that balance, we have concluded that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." We have, therefore, "consistently given greater deference to

*Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1st Cir.1994). I have not relied on the City's official descriptions of the plaintiffs' jobs which they claim the affidavits are intended to rebut. I have relied rather on the plaintiffs' own deposition testimony.

15. Wolfson testified that her specific duties included supervision of site coordinators, the Boston Neighborhood Basketball League and Aquatics Program, overseeing ten local councils, and the associated fifteen sites where those councils operated. In her responsibility for these sites, Wolfson was liaison between the BCC and the City of Boston's Public Facilities Department and the Real Property Department. Wolfson Dep., at 41–42. "I worked with the councils, I did orientation for the new members as requested. I worked in forming new advisory boards and councils for new sites ... In my job I was sort of an expert on nonprofit management, because I

had a background in that. I put together a book which I felt was necessary, Financial Management of Nonprofits for Boston Community Schools." Wolfson Dep., at 43–44. Wolfson drafted a manual for BCC, an orientation packet for council members, and a transition report when Menino became mayor that included a program profile for BCC. See Wolfson Dep., at 42–44.

While Wolfson had no authority to terminate individual board members, "I did have an ability working with the director and the senior staff to deal with the board in total that wasn't in compliance. So it wasn't an individual process, it was an overall process." Wolfson Dep., at 51. Wolfson would also recruit and present candidates for employment, and on some occasions would recommend finalists to the Executive Director after she had screened and interviewed applicants. See Wolfson Dep., at 63–65.

government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large."

*Umbehr*, —— U.S. at ——–——, 116 S.Ct. at 2347–2348 (citations omitted).

 Drawing a First Amendment line between what is and what is not protected speech in a government office is not an easy task. The "practical realities of government employment" justify many restrictions on speech that would be intolerable if imposed by the State on the public at-large. *Waters v. Churchill*, 511 U.S. 661, ——, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994). "[T]hough a private person is perfectly free to uninhibitedly and robustly criticize a state governor's legislative program, we have never suggested that the Constitution bars the governor from firing a high-ranking deputy for doing the same thing." Id. The public interest in the efficient delivery of government services is served by minimizing disruption in the government workplace. Consequently, we give deference to government predictions of harm even where unwelcome speech involves no "tangible, present interference with [an] agency's operation." Id. at ——, 114 S.Ct. at 1887. This deference, however, is not meant to be dismissive of First Amendment concerns.

> One could make a respectable argument that political activity by government employees is generally not harmful, or that high officials should allow more public dissent by their subordinates, or that even in a government workplace the free market of ideas is superior to a command economy. But we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential.

> . . . . .

> The restrictions discussed above are allowed not just because the speech interferes with the government's operation. Speech by private people can do the same,

but this does not allow the government to suppress it.

> Rather, the extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may, in the example given above, fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

Id. at ——, ——–——, 114 S.Ct. at 1887, 1887–1888 (citations omitted).

 In addition to promoting efficiency, government has a legitimate concern that dissident statements by high-ranking officials might be confused with statements of its own positions, thereby undermining the legitimacy of government in the eyes of the public. *Umbehr*, —— U.S. at ——, 116 S.Ct. at 2350. And finally, the public and the government share an interest in securing the ability of government to fulfill its electoral promises. One of the ways this is accomplished is through political appointments.

> [R]epresentative government needs a certain amount of leeway for partisan selection of agents in order to work. These agents may be policymakers, confidential employees, or others for whom party affiliation is an equally "appropriate" requirement. Appropriateness is, we think, a corollary to our system of determining the direction of governmental entities by the popular election of top office holders who have taken or are considered to have taken positions on one or more issues during a campaign. In order for the new adminis-

tration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance. The presence of such persons advances the goals of representative government; their absence, in *Elrod's* term, "undercut[s]" such government.

*Jimenez Fuentes,* 807 F.2d at 241 (citing [*Elrod*], 427 U.S. at 367, 96 S.Ct. at 2686–2687). Voters, in other words, should be able to expect that their choices at the ballot box will be reflected in the policies of those whom they elect. This is only possible if elected leaders have the freedom to staff the upper ranks of their administrations with persons loyal to the measures they espouse.

But experience with government scandals, and the enactment of so-called "whistleblower" statutes, have caused courts to hesitate at the full logic of representative democracy. They have instead conferred a core of First Amendment protection on government employees, particularly those seeking "to bring to light actual or potential wrongdoing [in the inner workings of government] or breach of public trust." *Connick v. Myers,* 461 U.S. 138, 148, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1982). "Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions. And a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters." *Waters,* 511 U.S. at ——, 114 S.Ct. at 1887 (citation omitted).

But exactly what speech by which government employees is protected?

▇ Some speech, no matter what the rank of the official, merits no First Amendment consideration at all, for example, speech by government employees concerning matters of purely private concern.

> When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

. . . . .

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick,* 461 U.S. at 146–147, 149, 103 S.Ct. at 1690, 1691.

On the other hand, speech by government employees involving matters of "public concern" is protected, although the term is not self-defining.

> The courts of appeals have adopted various approaches for determining whether a topic of employee speech is of "public concern,".... Some courts have adopted a content-based analysis, focusing exclusively on "'which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government,".... Other courts have adopted an analysis which turns either entirely or in part on the employee's subjective intent, i.e., on whether the employee's speech *"was calculated* to disclose misconduct" or to inspire public debate on some issue of significant public interest....

> As our own case law implicitly recognizes, the circumstances of a particular case may govern the appropriate approach under

*Connick.* Where a public employee speaks out on a topic which is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the "form and context" of the expression.... On the other hand, public-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone,* as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more complete *Connick* analysis into the form and context of the public-employee expression, "as revealed by the whole record," *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690, with a view to whether the community has *in fact* manifested a legitimate concern in the internal workings of the particular agency or department of government, and, if so, whether the "form" of the employee's expression suggests a subjective intent to contribute to any such public discourse.

*O'Connor v. Steeves,* 994 F.2d at 913–914 (citations omitted).

In the *Elrod–Branti* context, as previously observed, courts have indulged the need of elected officials to select their immediate subordinates on the basis of loyalty. But does an administration have as free a hand in dismissing an official when speech rather than political affiliation is at issue? The answer is no. When government takes an adverse action arguably based on speech involving matters of public concern, the First Amendment requires that

"[w]e apply the balancing test from *Pickering* .... *Elrod* and *Branti* involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the

requirement was appropriate for the employment in question. There is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's beliefs and allegiances ought not to be subject to probing or testing by the government. It is true, on the other hand, as we stated at the outset of our opinion, *supra,* at 2355, that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement.

*O'Hare Truck Service,* —— U.S. at ——– ——, 116 S.Ct. at 2357–2358 (citation omitted).[16]

While in "mixed" cases, where both speech and political affiliation are concerned, the *Pickering* mandates are "inevitable," in striking the balance, *Elrod–Branti* considerations must come into play.[17] The more senior the official, the more likely his statements will be perceived by the public as pronouncements of government policy, or in the case of his co-workers, as an invitation to insubordination. Thus, the higher an official's position, the more reasonable it would seem for an administration to insist on loyalty in both deed and word.

 Here plaintiffs contend that they were dismissed for objecting to the hiring of political allies of the Mayor,[18] for objecting to the "mishandling" of two sexual harassment complaints by Riesenberg, and for protesting

16. In *O'Hare Truck Service,* Justice Kennedy found it necessary to remand the case to the district court to determine, "including upon motion for summary judgment if there is no genuine issue as to material facts" whether *Elrod–Branti* or *Pickering* (or arguably both) governed. —— U.S. at ——, 116 S.Ct. at 2361.

17. I say this mindful of Justice Scalia's dissenting view that the *Umbehr* and *O'Hare* decisions cannot be reconciled. —— U.S. at ——, 116 S.Ct. at 2372. Respectfully, I believe that they can.

18. Plaintiffs also label these hires as "unqualified," the plaintiffs, however, have presented nothing of a material nature of suggest that this is true.

her politicization of BCC's personnel practices. See Plaintiffs' Supplemental Memorandum, at 1–4. These are matters, plaintiffs argue, of profound public concern.

In some respects, plaintiffs may be right. But simply to label one's speech a matter of public concern does not inevitably rig the *Pickering* scale against dismissal. Rather, as here, we must weigh the interest of the Mayor in entrusting policy functions to officials sympathetic with the aims of his administration against the plaintiffs' claims that their speech implicated matters of public concern. The most serious claim is the allegation that plaintiffs were fired for objecting to Riesenberg's "giving favorable treatment to, protecting, and covering up for certain individuals accused of sexual harassment." Plaintiff's Supplemental Memorandum, at 10. The difficulty is that there is no evidence that this is true. Plaintiffs offer nothing that suggests a coverup or "suppression" of sexual harassment claims by Riesenberg. Plaintiffs offer evidence only of their disagreement with the manner in which Riesenberg chose to handle such complaints. Moreover, plaintiffs did nothing to bring their concerns about Riesenberg's decisions to public attention, or to the attention of anyone "with representative responsibility for acting in the best interests of the [City] and its citizenry." *O'Connor*, 994 F.2d at 917. To the minimal extent that plaintiffs voiced objections, they confined their remonstrations to Riesenberg, whom they portray as the problem, not the solution. There may be times when the fact that a sensitive matter is articulated privately to a government supervisor weighs in a plaintiff's favor as minimizing disruption of governmental functions "by limiting dissemination [of criticism] to the public authorities most directly concerned." Id. at 917 n. 10. See also *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979). But here, even assuming that plaintiffs articulated more than mere disagreement with Riesenberg's decisions, they point to nothing that suggests that their speech "was calculated to disclose misconduct" or contribute to the public discourse. See *O'Connor v. Steeves*, 994 F.2d at 913–914.

In other respects, plaintiffs exaggerate the record. There is little or no evidence that they voiced any objection to Riesenberg's hiring of Clabaugh or to her suggestion that Clabaugh refuse a job interview to a politically undesirable applicant, or to her indulgence of job candidates sponsored by the Mayor, however much they may have privately disagreed with her actions. Speech unexpressed can hardly raise a subject of public concern or be a basis for retaliation. Plaintiffs' vocal disagreements with Riesenberg over possible violations of the terms of a federal grant and a collective bargaining agreement fall within the category of internal office speech that *Connick* places altogether outside the protection of the First Amendment. In sum, I find that there is no evidence of any speech of the kind protected in the government workplace that would support a claim of retaliation.[19]

██ Because the plaintiffs' firings were not constitutionally impermissible, I need not address the claims brought against the Mayor personally,[20] although plaintiffs in any event have not made the showing of personal participation on the Mayor's part that would be necessary to establish liability. See *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 901–902 (1st Cir.1988). The fact that the Mayor refused to overrule Riesenberg's decision to dismiss the plaintiffs or that he relied on the opinion of the Corporation Counsel that their firings were justified are insufficient to show the requisite degree of supervisory encouragement, or deliberate in-

---

**19.** Because I find that the City was justified in firing plaintiffs for their lack of political affiliation, and because I conclude that plaintiffs have failed to meet their burden of showing that they engaged in speech that the First Amendment would protect, I need not discuss the City's alter-native defense that plaintiffs were terminated as part of a reorganization of BCC.

**20.** The plaintiffs' claim against the City fails for the same reason. Even if a custom or practice could be shown on the part of the City of Boston permitting its Mayors to freely discharge political

difference on his part, necessary to show a constitutional violation. See *Hegarty v. Somerset County*, 53 F.3d 1367, 1379–1380 (1st Cir.1995).[21]

 Count VI contains a common law allegation of wrongful termination, presumably pursuant to the public policy exception to the usual rule that permits the termination of at-will employees for any reason or for no reason at all. See *Jackson v. Action for Boston Community Development, Inc.*, 403 Mass. 8, 9, 525 N.E.2d 411 (1988). Whether a retaliatory firing violates public policy is a matter of law for the court. *Wright v. Shriners Hospital for Crippled Children*, 412 Mass. 469, 472, 589 N.E.2d 1241 (1992). While the Supreme Judicial Court has, in dicta, indicated that there may be circumstances in which a "whistleblowing" employee is entitled to public policy protection, Flynn and Wolfson's "speech", that is, their differences, expressed and unexpressed, with Riesenberg's decisions, does not fall within this narrowly circumscribed and as yet unestablished exception to the at-will rule. See *Mel-*

*lo v. Stop & Shop Cos.*, 402 Mass. 555, 560 n. 6, 524 N.E.2d 105 (1988).[22]

### ORDER

For the foregoing reasons, the motions of defendants Mayor Menino and the City of Boston for summary judgment on Counts I, IV and VI of the Amended Complaint are *ALLOWED*. Defendant Riesenberg's motion for summary judgment as to Counts I, IV and VI of the Amended Complaint is also *ALLOWED*.

SO ORDERED.

---

subordinates, that is nothing that the law condemns.

21. Plaintiffs proffer several pleadings in unrelated cases and newspaper articles alleging that Mayor Menino has terminated other city employees because of their political affiliation. These documents are inadmissible on the issue whether the Mayor had a direct hand in Riesenberg's termination of Flynn and Wolfson. See *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990) (hearsay evidence inadmissible at trial cannot be considered on a motion for summary judgment).

22. "Redress is available for [at-will] employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury.")." *Smith–Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149–150, 533 N.E.2d 1368 (1989). See also *Fairneny v. Savogran Company*, 422 Mass. 469, 471–472, 664 N.E.2d 5 (1996) (same, retaliation for carrying out ERISA fiduciary duty, redress preempted, however, by federal law). "In limited circumstances, we also have permitted redress 'for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed.' " *GTE Products Corp. v. Stewart*, 421 Mass. 22, 26, 653 N.E.2d 161 (1995). See *DeRose v. Putnam*

*Management Co.*, 398 Mass. 205, 208–210, 496 N.E.2d 428 (1986) (refusing to commit perjury); *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 810–811, 575 N.E.2d 1107 (1991) (cooperating with a government investigation). Disputes over internal business matters or policies cannot be the basis of a public policy exception to the at-will rule. *Smith–Pfeffer*, supra at 151, 533 N.E.2d 1368; (administrative policies and institutional reorganization); *Mistishen v. Falcone Piano Co.*, 36 Mass.App.Ct. 243, 246, 630 N.E.2d 294 (1994) (disagreement over manner in which employer honored its warranties); *King v. Driscoll*, 418 Mass. 576, 582, 583, 638 N.E.2d 488 (1994) (dispute over shareholder derivative suit contesting price to be paid under a stock buy back—"[t]his court consistently has interpreted the public policy exception narrowly"). "[I]t is not necessarily true that the existence of a statute relating to a particular matter is by itself a pronouncement of public policy that will protect, in every instance, an employee from termination." Id. at 584, 638 N.E.2d 488. In very limited circumstances, a corporate in-house counsel may have a claim for wrongful discharge if the claim "depends on (1) explicit and unequivocal statutory or ethical norms (2) which embody policies of importance to the public at large in the circumstances of the particular case, and (3) the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets." *GTE Products Corp.*, supra, at 30, 653 N.E.2d 161.