Fabricant, Judith, J.
INTRODUCTION
This action arises from the termination of the plaintiffs employment as a sales manager for investment products. The plaintiff claims that he was not paid promised commissions, that his supervisor interfered with his commission contract to usurp commissions for himself, and that his employer’s corporate parent also interfered with his commission contract for its own financial benefit. Before the Court are the motion of all defendants to dismiss for failure to state a claim on which relief may be granted, and a separate motion of defendant The Robeco Group to dismiss for lack of personal jurisdiction and inadequate service of process. After hearing, and review of all materials submitted, for the reasons that will be explained the motions will be denied.
THE ALLEGATIONS OF THE COMPLAINT
The plaintiff s complaint presents the following factual allegations. The Robeco Groep, N.V, an entity based in Rotterdam, markets and sells investment products to institutions worldwide, under the name of Robeco Group. Robeco Investment Management, Inc. (“RIM”), a Delaware corporation with an office in Boston, is a wholly owned subsidiary of Robeco Group. From late 2003 until early 2005, RIM recruited the plaintiff, Paul Heffernan, for employment.
During the recruitment process, Michael Jones, RIM’s Director of Global Marketing “stated that the compensation plan for RIM sales professionals consisted of a base salary and a commission. The base salary started at $175,000. Jones informed Heffernan that RIM sales professionals received commissions on their sales of investment products based on a percentage of revenue generated by the product sale over three years. The RIM commission structure was as follows: 20% of first year revenue, 10% of second year revenue, and 5% of third year revenue. In total, a commission constituted 35% of the revenue generated by a product sale over a three-year period. Jones indicated to Heffernan that RIM sales professionals made a yearly income between $750,000 to $1,000,000.” Heffernan joined RIM in February of 2005, with a base salary of $175,000. He “was promised a guaranteed payment of $250,000 in his first year of employment as a draw against commissions to be paid quarterly.” William Supple was his direct supervisor.
In early 2006, Heffernan made contact with PSP Investments, which was interested in making a large investment in Robeco Group’s Emerging Markets Equity (“EME”) product. After Heffernan had devoted *238 substantial effort to that potential sale, Supple injected himself into the process, and told Heffernan that the two of them would split the commissions. Heffernan continued to devote substantial effort to this potential sale, which culminated in a large-scale transaction in the summer of 2006.
In early 2006, Heffernan learned of a request for proposals from CalPERS, a large pension fund. Heffernan “led and managed RIM’s preparation and submission of a response to the RFP,” and then engaged in a “complex and time intensive” process of preparing for a presentation regarding Robeco’s EME product, including training Robeco Group personnel in Rotterdam to make the presentation. His efforts culminated in a large-scale contract with CalPERS, signed in the fall of 2006.
In early 2006, Heffernan heard rumors that Robeco Group “planned to change RIM’s commission structure for all sales of EME Product” by allocating two thirds of revenue on sales of EME to Robeco Group, and only one third to RIM. That allocation of revenue would effectively cut commissions for RIM sales personnel by two thirds. Supple assured Heffernan that he would prevent the change, and Heffernan continued his sales efforts “based on Supple’s assurances.” Heffernan was never informed that the rumored change had occurred.
On December 7, 2006, Heffernan was abruptly fired, without cause. He has never been paid any commissions on the PSP and CalPERS sales. The complaint alleges on information and belief that after Heffernan’s termination RIM has paid commissions on the revised basis that had been rumored, “at the direction of’ Robeco, and that Supple has received commissions on the PSP contract. The complaint further alleges on information and belief that Supple “characterized Heffernan as a dissenter and malcontent to promote his own scheme of minimizing Heffernan’s contributions to encourage his termination, and take Heffernan’s commissions for himself... motivated by his personal animus toward Heffernan and his professional successes.”
Based on these factual allegations, the complaint asserts claims of breach of contract and of the implied covenant of good faith and fair dealing against RIM and Robeco Group (counts I and II), promissory estop-pel or unjust enrichment against RIM and Robeco Group (count III), and interference with contractual relations against Supple and Robeco Group (counts IV and V).
DISCUSSION
1. The Motion of All Defendants to Dismiss for Failure to State a Claim.
All defendants move to dismiss all counts for failure to state a claim. As to counts I and II, they contend that the alleged contract is unenforceable under the statute of frauds, and that the factual allegations do not identify the Robeco Group as a party to it. As to count III, they contend that the alleged representations regarding commissions are insufficient to support reasonable reliance. Regarding Count IV, defendants argue both that the complaint fails to allege an enforceable contract, and that it does not sufficiently allege that Supple acted with actual malice. Finally, as to count V, defendants argue that the claim is inconsistent with Heffernan’s allegation against Robeco Group that it breached his commission contract, and that the complaint does not sufficiently allege that Robeco Group acted with malice.
In considering a motion to dismiss, the Court must take the well-pleaded allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiff. See Harvard Law Sch. Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992); General Motors Acceptance Corp. v. Abington Cas. Ins. Co., 413 Mass. 583, 584 (1992); Okerman v. VA Software Corporation, 69 Mass.App.Ct. 771, 774-75 (2007). A complaint may properly be dismissed for failure to state a claim when it appears certain “that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting from Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Court applies this standard here.
A. The Statute of Frauds.
The parties agree that the contract alleged in the complaint is subject to the statute of frauds, G.L.c. 259, §1, 5, in that it could not be fully performed within one year. See Meng v. Trustees of Boston Univ., 44 Mass.App.Ct. 650, 651-52 (1998). Relying on the statute, the defendants contend that the contract-based claims in the complaint must be dismissed because the complaint does not allege that the contract was in 'writing. A plaintiff need not affirmatively allege a writing to survive a motion to dismiss; to the contraiy, the statute of frauds is an affirmative defense, as to which the burden of pleading and proof is on the defendant. See Mass.R.Civ.P. 8(c). Thus, dismissal on this ground would be warranted only if the allegations of the complaint were to establish the absence of a writing adequate to satisfy the statute of frauds.
The Court is not persuaded that that is the case here. The complaint alleges that Jones made certain statements about commissions, base salary, and expected total income. It does not say whether those statements were oral or written. The allegations would certainly be consistent with oral representations, but they are also consistent with written ones, or a combination of the two. Under the standard applicable here, on a motion to dismiss, the allegations are adequate to establish the existence of an enforceable contract.
B. Robeco Group as a Party to the Contract.
The complaint names Robeco Group, as well as RIM, in counts I and II, as if it were a party to the *239 contract, although the complaint never explicitly alleges that it was. Robeco Group contends that it should be dismissed on that ground. The plaintiff responds that the facts alleged would support a conclusion that Robeco was a party to the contract as a co-employer with RIM, either because an employment relationship may be implied from the work Heffernan performed in marketing Robeco’s product, or on the theory that RIM acted as Robeco’s agent in entering into the employment contract. The Court agrees.
A contract of employment, like any other type of contract, “may be ‘inferred from the conduct of the parties and from the attendant circumstances.’ ” Monaco v. Lombard Brothers, Inc., 24 Mass.App.Ct. 941, 942 (1987). Here the complaint alleges that Heffernan was recruited and hired by RIM, but that thereafter he devoted substantial time and effort to selling Robeco’s product, including training Robeco personnel to conduct presentations on the product, and dealing directly with Robeco personnel in connection with negotiations regarding such sales. Under the indulgent standard applicable on a motion to dismiss, these allegations are enough to support the inference that the plaintiff served as an employee of Robeco and RIM jointly, on the terms that RIM promised the plaintiff, and that in promising those terms RIM acted both for itself and as agent for Robeco.
C.Promissory Estoppel.
In count III, the plaintiff seeks to enforce the alleged promise of commissions against both RIM and Robeco Group on the alternative theory of promissory estop-pel, or unjust enrichment. As the plaintiff acknowledges, this count is essentially a fallback position, in case counts I and II fail for lack of an adequate writing or other reasons. See Loranger Const. Corp. v. E.F. Hauserman Co., 376 Mass. 757, 761 (1978). Defendants argue that this count should be dismissed because the facts alleged would not support a finding of reasonable reliance. They focus in particular on the alleged statement that “RIM sales professionals made a yearly income between $750,000 to $1,000,000.” If that statement alone were the basis of the claim, the Court would agree that it could not support reasonable reliance. The promise alleged in the complaint, however, is considerably more specific and definite, including a precise commission schedule. At this stage, applying the standard for a motion to dismiss, the Court cannot say that the facts pled could not support a claim of reasonable reliance.
D.Interference with ContractWilliam Supple.
Count IV alleges that William Supple committed the tort of intentional interference with contractual relations by maneuvering to usurp the plaintiffs commissions on the sales to PSP and CalPERS. Supple contends that this count should be dismissed because the facts alleged would not support a finding that he acted with actual malice, which plaintiff must show to assert this claim against a corporate official. See Blackstone v. Cashman, 448 Mass. 255, 260-66 (2007). Actual malice, for this purpose, means “a spiteful and malignant purpose, unrelated to the legitimate corporate interest.” Id. at 261, quoting Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 476 (1992). Personal dislike, and the motive to seek personal financial gain, are generally not enough to meet this requirement. See King v. Driscoll, 418 Mass. 576, 587 (1994).
The complaint alleges that Supple’s conduct was “motivated by self-interest and personal animus toward Heffernan and his superior skills and experience securing large institutional clients.” With inferences drawn in plaintiffs favor, this allegation may be understood as claiming that Supple acted out of resentment toward the plaintiff for his success, as well as out of personal greed. In the context of the facts alleged, neither motive serves any interest of the corporation; indeed, to the extent that Supple’s alleged conduct had the potential to deprive the corporation of the plaintiffs best efforts, and ultimately of his services, it would be contraiy to the corporate interests. In that respect, the motive alleged goes beyond personal greed, extending to a willingness to sacrifice the corporate interest for personal interest. For that reason, the Court concludes, the facts alleged are sufficient at this stage.
E.Interference with ContractRobeco Group.
Count v. alleges that Robeco Group interfered with the plaintiffs contract with RIM by changing the revenue allocation arrangement between Robeco and RIM, so as to reduce RIM’s revenue from the plaintiffs sales of Robeco’s product, and thereby reduce the plaintiffs commissions. Robeco seeks dismissal of this claim on a number of grounds, most significantly that if Robeco was a party to the contract, as counts I and II implicitly allege, it cannot be liable for interference with the contract. See Harrison v. Netcentric Corp., 433 Mass. 465, 476 (2001). The point is clearly correct, but does not require dismissal. Here again, the plaintiff has pled alternatives, apparently offering count v. as a fallback in case he fails in his effort to establish a contractual relationship with Robeco. He is free to keep his options open at this stage, although obviously he will not be permitted to recover judgment on inconsistent theories.
Count v. presents a more substantive issue, however. To state a claim against Robeco for interference with contract, the plaintiff must allege that Robeco acted for an improper purpose or by improper means. See Blackstone v. Cashman, 448 Mass. at 260. The only motive alleged is financial gain, which in itself is insufficient. See King, 418 Mass. at 587. As for means, the allegation is merely that Robeco changed the allocation of revenue between itself and RIM on sales of Robeco’s product. That action would be improper only if it were in violation of some contractual or other duly Robeco had either toward RIM or toward the *240 plaintiff. The complaint contains no explicit allegation in that regard. Indeed, the complaint contains no information whatever about any contract between RIM and Robeco. As for the plaintiffs contract with RIM, it alleges only that he was to receive commission “based on a percentage of revenue generated by the product sale,” without any definition of revenue or indication of how revenue was to be determined. The question, then, is whether the complaint can fairly be interpreted to allege an agreement that commissions would be paid on all revenue generated from sales, regardless of which corporate entity received it. Here again, the plaintiff is entitled to all reasonable inferences in his favor. Under that standard, although the question is close, the Court concludes that the allegations maybe so interpreted. Accordingly, the motion to dismiss for failure to state a claim will be denied.
2. Robeco Group’s Motion to Dismiss for Lack of Personal Jurisdiction and Inadequate Service.
A. Procedure and Standard of Proof.
In connection with the motion to dismiss, the parties have provided evidentiary material beyond the complaint, consisting of affidavits of the plaintiff and of William J. Kelly, chief executive officer of RIM. These affidavits present conflicting factual assertions, as well as assertions as to which the parties urge conflicting inferences. The motion thus presents the initial question of how the Court should treat this material, and how it should resolve the factual conflict for purposes of this motion, pursuant to Mass.R.Civ.P. 12(b)(2) and 12(b)(5).
The Appeals Court addressed that question in Cepeda v. Kass, 62 Mass.App.Ct. 732, 737-40 (2004). Relying on federal cases under Fed.R.Civ.P. 12(b)(2), the Court held that the Massachusetts rule grants trial courts “considerable leeway,” and that the most common approach is to determine the motion solely on affidavits and other written evidence, applying a “prima facie standard.” Id. at 737. Under this approach, the Court “preliminarily reserves the jurisdictional issue, unless waived by the defendant, for final determination at trial, pursuant to a preponderance of the evidence standard.” Id. At the motion stage, the Court decides “only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction . . . The prima facie showing of personal jurisdiction must be based on evidence of specific facts set forth in the record.” Id., quoting Boil v. Gar-Tec Prod., Inc., 967 F.2d 671, 675 (1st Cir. 1992). “In evaluating a prima facie showing, the court acts as a data collector, not as a fact finder.” Cepeda, 62 Mass.App.Ct. at 737-38. Thus, the Court must “take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiffs jurisdictional claim.” Id., quoting Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assn., 142 F.3d 26, 34 (1st Cir. 1998). Cepeda also authorized an alternative approach, in which the Court conducts an evidentiary hearing on the motion, and makes a final determination of the facts relating to jurisdiction, applying the preponderance of the evidence standard. See 62 Mass.App.Ct. at 739. The choice between the two approaches is a matter of discretion, to be exercised on consideration of fairness to the parties. See id. at 738.
Here, the facts on which jurisdiction will ultimately depend are closely intertwined with the merits of the claims against Robeco, as discussed supra. That circumstance counsels strongly against the Court hearing evidence and making a final determination of disputed facts at this stage, prior to any discovery. Moreover, whatever happens regarding this motion, the case will proceed with respect to Robeco’s wholly-owned subsidiary and one of its executive employees, both of whom are represented by the same counsel who presses this motion on behalf of Robeco. Under these circumstances, in the Court’s view, the prima facie approach is the most efficient and fair to all parties.
B. The Factual Record.
Applying that approach, the Court takes as true not only the allegations of the complaint, but also the additional facts set forth in the plaintiffs two affidavits, even though contradicted in certain respects by the affidavit of William Kelly. Those facts include the following. In recruiting the plaintiff, representatives of RIM informed him that RIM was a wholly-owned subsidiary of Robeco, that prior to its acquisition by Robeco, RIM had been “a private investment company known as Boston Partners,” and that Robeco is “a Dutch investment firm that markets and sells investment products to institutions and individuals worldwide.” Robeco describes itself on its website in the same terms, and announces that “(t]o service institutional and third-party distribution clients,” it has offices in a list of places around the world, including in the United States, and that its various investment strategies “are managed from Rotterdam (head office), Paris, Boston and New York.”[1]
During his employment with RIM the plaintiff learned that after its acquisition by Robeco certain executives of Robeco “had assumed residence in the New York and Boston offices of RIM.” One became a portfolio manager in the Boston office; another became chief financial officer, based in New York, but travels to the Boston office approximately monthly. During the plaintiffs employment Robeco’s CEO, as well as the CEO of Robeco Asset Management, another subsidiary, “made multiple trips from Rotterdam to the Boston office” as part of Robeco’s “management of its investments and strategies through that office.”
In 2005, Robeco decided to introduce its EME product in North America. For that purpose, it relocated one of its executives, Tim Kruis, to RIM’s New York office, where he became responsible for “training *241 the U.S. sales force of RIM and service as product expert to assist the marketing professionals in North America sales initiatives.” In that capacity Kruis came to the Boston office approximately monthly, and participated with the plaintiff in multiple communications both with potential clients and with Robeco personnel in the Netherlands.
The plaintiff himself, from RIM’s Boston office, “directed and participated in” the development of “extensive data and material” describing EME and comparing it to other products. He also, along with Tim Kruis, prepared Robeco personnel based in the Netherlands for a presentations to PSP and CalPERS. That process occurred through multiple telephone calls, faxes, and e-mails between Boston and Rotterdam, as well as in a three-day visit by the plaintiff to Rotterdam. Robeco personnel reserved to themselves authority to approve fees for sales of the EME product. To obtain that approval with respect to the sales to PRS and CalPERS, the plaintiff and Kruis engaged in a process of negotiation that involved “dozens” of communications with ROBECO personnel from Boston by telephone, fax, and e-mail. The plaintiffs sales to PRS and CalPERS culminated in commitments by those clients to fund investments of hundreds of millions of dollars. Under the arrangement the plaintiff believes to be in effect, based on discussions with RIM personnel, Robeco would retain two thirds of the revenue generated by those transactions.[2]
During the plaintiffs employment, “Robeco Group and RIM held themselves out to potential customers as the same entity”; RIM personnel referred to themselves in sales presentations as “the Robeco team,” and the EME product they sold as a “Robeco product.” They “did not emphasize any distinction to the customer as to whether the EME Product was generated or managed by The Robeco Group or RIM.” In 2006, Robeco “undertook a massive ‘re-branding’ initiative, in which references to the various and numerous Robeco entities were eliminated from many marketing materials, such as business cards, product brochures, advertisements, etc., and the name ‘ROBECO’ in large print was substituted with a smaller reference to RIM.”
Finally, the plaintiff provides a document that he describes as “an example of a standard proposal provided to prospective clients” by RIM. The document states that “RIM’s Internal Audit Department reports functionally to the Director of Internal Audit in Rotterdam and administratively to William J. Kelly, RIM’s Chief Executive Officer.”
C. The Legal Standard for Personal Jurisdiction.
Personal jurisdiction over a non-resident defendant depends on a two-pronged test. First, the defendant’s conduct must fall within the limits of the Massachusetts longarm statute, G.L.c. 223A, §3(a)-(h). Second, if jurisdiction is authorized by statute, its exercise must also comply with the basic due process requirements mandated by the United States Constitution. See Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994). Often this two-part test converges into a single inquiry, since G.L.c. 223A “functions as ‘an assertion of jurisdiction’ over the person to the limits allowed by the Constitution of the United States.” Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 6 (1979), quoting Automatic Sprinkler Corp. of America v. Seneca Foods Corp., 361 Mass. 441, 443 (1972).
D. Application of the Standard.
The plaintiff contends that Robeco’s business contact with Massachusetts, along with its role in breaching Heffernan’s employment agreement, create personal jurisdiction under G.L.c. 223A, §3(a), (b), and (d). Under G.L.c. 223A, §3(a), personal jurisdiction attaches to a defendant if (1) it has transacted any business in Massachusetts, and (2) the cause of action arose from that business. See Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 6 (1979). “Transacting any business” has been liberally construed, to include “any purposeful acts, whether personal, private, or commercial.” Ross v. Ross, 371 Mass. 439, 442 (1976).
Here, the facts provided by the plaintiff, taken as true and construed with reasonable inferences in favor of jurisdiction, indicate that Robeco maintains close and direct involvement in the management of RIM’s affairs, and indeed that it touts that close involvement to its prospective clients through its website and its standard proposal. Further, the record indicates that Robeco sells its products in the United States through the efforts of RIM personnel based in Boston, and that its own personnel, based in Rotterdam, have direct and continuing involvement in that sales process, including making presentations to clients after receiving training from Boston personnel, and participating in extended negotiations over fees. The record also reveals that Robeco encourages the use of its name by RIM personnel. These activities are sufficient to satisfy the first requirement under G.L.c. 233A, §3(a). See Kleinerman v. Morse, 26 Mass.App.Ct. 819, 824 (1989) (“active entrepreneurial or managerial conduct in the State where jurisdiction is asserted will cause jurisdiction to attach”).
With respect to the second prerequisite for personal jurisdiction under G.L.c. 233A, §3(a), Massachusetts has adopted a “but for” analysis under which “a claim arises from a defendant’s transaction of business in the forum State if the claim was made possible by, or lies in the wake of, the transaction of business in the forum State.” Tatro v. Manor Care, Inc., 416 Mass. 763, 770-71 (1994). Here, the plaintiffs claims arise from Robeco’s efforts to sell its EME product in North America; were it not for that effort, the plaintiff would not have made the sales that form the basis for his claims for commissions. The record thus establishes a prima facie case of jurisdiction under G.L.c. 233A, §3(a). The Court therefore need not consider whether personal jurisdiction would also exist under G.L.c. 233A, §3(b) or (d).
*242 Always underlying personal jurisdiction analyses is the constitutional question of whether a defendant has, by some "affirmative, intentional act,” “purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State thus invoking the benefits and protections of its laws,” “such that it is fair and reasonable to require the defendant to come into the State to defend the action.” Good Hope Indus., Inc., 378 Mass. at 7, quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958). A defendant’s contacts with Massachusetts must have been “deliberate and not fortuitous, such that ‘the possible need to invoke the benefits and protections of the forum’s laws was reasonably foreseeable, if not foreseen, rather than a surprise.’ ’’ Good Hope Indus., Inc. 378 Mass. at 10, quoting Product Promotions, Inc., v. Cousteau, 495 F.2d 483, 496 (5th Cir. 1974).
Here, Robeco expended great effort in promoting its EME Product in North America, through activities conducted by the plaintiff, from RIM’s Boston office, as well as other RIM personnel. In the process, it engaged in regular and on-going communications with the plaintiff and others in Boston. As a result of those efforts, it has also derived revenue from fees on very substantial investments of funds. In light of these deliberate and voluntary contacts with Massachusetts, it should not now come as a surprise to Robeco Group that it is haled into court here. The constitutional requirement is satisfied.
E. Service of Process.
Contemporaneously with the filing of the complaint, the plaintiff filed an ex parte motion for leave pursuant to Mass.R.Civ.P. 4(e)(5) to serve Robeco by serving RIM. In support of that motion, the plaintiff represented that RIM is Robeco’s wholly owned subsidiary, that RIM hired the plaintiff “to sell products of both Robeco Group and RIM,” that the plaintiff “worked extensively with representatives from both Robeco Defendants in Boston and abroad,” and that “[d]espite selling securities and transacting substantial business in the United States, Defendant Robeco Group is not organized or registered under the laws of any state.” The Court (Gants, J.) allowed the motion, and service for Robeco was made on a registered agent of RIM. Robeco contends that such service was insufficient as a matter of law, and that the Court’s order authorizing it was in violation of the Hague Service Convention.[3]
The Hague Service Convention provides a mechanism for service of process in foreign nations, when such service is necessary under the law of the state in which a proceeding is occurring. See Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699-700 (1988) (Hague Service Convention applies when state law mandates transmittal of judicial documents for service abroad); Lamb v. Volkswagenwerk Aktiengesellschaft, 104 F.R.D. 95, 96-97 (S.D. Fla. 1985) (“By its terms, The Hague Convention is applicable only to attempts to serve process in foreign countries”). When service abroad is necessary, states are not free to prescribe alternative methods; as a matter of supremacy, the convention “preempts inconsistent methods of service prescribed by state law in all cases to which it applies.” Volkswagenwerk Aktiengesellschaft, 486 U.S. at 699.
The Hague Service Convention does not purport to, and does not, determine the circumstances under which service abroad is necessary, or those in which service on a foreign entity can be made within the United States; that determination depends on state law, subject to due process constraints. Id. at 707. “While normally the Hague Service Convention governs service of process upon foreign entities, service upon the United States agent of a foreign corporation is sufficient.” Sankaran v. Club Mediterranee, S.A., 1998 WL 433780 *5 (S.D.N.Y. 1998), citing Mirrow v. Club Med., Inc., 118 F.R.D. 418, 418-19 (E.D.Pa. 1986).
General Laws c. 223, §§37 and 38, and Mass.R.Civ.P. 4(d) and (e) determine how and where service of process may be made for cases in Massachusetts Courts. Chapter 223, §38, provides that any foreign corporation that is engaged in or soliciting business in Massachusetts may be served in accordance with §37, which governs service on domestic corporations. That section, in turn, provides for service “upon the president, treasurer, clerk, resident agent appointed pursuant to section 49 of chapter 156D, cashier, secretary, agent or other officer in charge of its business,” or if no such person is found, upon any member of the corporation. Rule 4(d)(2) implements these statutory provisions, authorizing service on a domestic or foreign corporation subject to suit within the Commonwealth by delivering a copy of the summons and complaint “to an officer, to a managing or general agent, or to the person in charge of the business at the principal place of business thereof within the Commonwealth, if any; or by delivering such copies to any other agent authorized by appointment or by law to receive service of process.”
Mass.R.Civ.R Rule 4(e) provides for various methods of service outside the Commonwealth, “(w]hen any statute or law of the Commonwealth authorizes service of process outside the Commonwealth.” The plaintiff does not contend that in this case Massachusetts law authorized or required service on Robeco outside the Commonwealth; indeed, the plaintiff contends the opposite. For that reason, Rule 4(e) was inapplicable, and the plaintiffs invocation of Rule 4(e)(5) in its ex parte motion was inappropriate. The applicable provision was Rule 4(d)(2). In seeking leave to serve Robeco by serving RIM, the motion effectively soughtand ob-taineda judicial determination that RIM is a “managing or general agent” for Robeco within the meaning of this rule. If that determination was correct on the facts *243 now before the Court, then service was sufficient under Rule 4(d)(2), as authorized by G.L.c. 223, §38.
The parties have cited no Massachusetts authority explicating the term “managing or general agent” under Rule 4(d)(2), and the Court is aware of none. A handful of federal cases have addressed the equivalent issue under the federal rules in a variety of factual contexts. See Furukawa Elec. Co. of North America v. Yangtze Optical Fibre and Cable Co., Ltd., 2005 WL 3071244 (D.Mass. 2005); Sankaran, 1998 WL433780 (S.D.N.Y. 1998); Mirrow, 18 F.R.D. at 418-19. The only clear rule that emerges from these cases is that the question is fact specific. See Sankaran v. Club Mediterranee, S.A., 1998 WL 433780 at 5. A mere parent-subsidiary relationship is not sufficient, id., but corporate separateness alone does not preclude an agency relationship for this purpose. The question is whether, under the particular facts presented, “there is a sufficiently close relationship between a United States entity and a foreign entity such that service upon the United States agent is sufficient to provide notice to the foreign defendant.” Id.
Relevant factors include whether the resident entity performs all the functions for the foreign entity that the foreign entity would if it were doing business in the state by its own officials, the extent of common ownership and common officers, and generally the extent to which the foreign entity operates in the forum through the resident entity. See Furukawa Elec. Co. of North America v. Yangtze Optical Fibre and Cable Co., Ltd., 2005 WL 3071244 (D.Mass. 2005); Sankaran, 1998 WL 433780 at 5. Where the resident entity is a sales representative, it is also pertinent whether the representative has authority to establish prices, terms or conditions of contracts or orders. See Dodco, Inc. v. American Bonding Co., 7 F.3d 1387, 1389 (8th Cir. 1993); Grammenos v. Lemos, 457 F.2d 1067, 1072-73 (2d Cir. 1972); Furukawa Elec. Co., 2005 WL 3071244 (D.Mass. 2005) at 2.
The factual determination that is necessary for this purpose is closely related to the factual determination that governs personal jurisdiction. Indeed, it has been said that “when, because of its activities through a local entity, a corporation is doing business for jurisdictional purposes within a district, that entity is its ‘managing or general agent’ ” for purposes of service. Samson Cordage Works v. Wellington Puritan Mills, Inc., 303 F.Sup. 155, 160 (D.R.I. 1969), citing Bomze v. Nardis Sportswear, Inc., 165 F. 2d 33, 37 (2d Cir. 1948) (construing New York law to hold that “whatever activities make the corporation ‘present,’ the agent in charge of those activities is the ‘managing agent’ pro had vice”).
Here, the facts discussed supra with respect to the issue of jurisdiction establish a close relationship between Robeco and RIM. Robeco used RIM and its Boston-based employees to sell Robeco’s product in North America. Robeco was closely involved in the sales process, and retained authority to set terms for sales, but it encouraged RIM personnel to use its name, and maintained close involvement in RIM’s operations. RIM announced to its customers that its audit department reports effectively to Robeco, and Robeco announced on its website that it manages its investment products from Bostonthat is, through RIM. These facts, the Court concludes, suffice to make RIM Robeco’s “managing or general agent” for purposes of Rule 4(d)(2). If follows that service on Robeco by service on RIM was proper under that rule. The motion to dismiss for insufficient service will therefore be denied
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motion to Dismiss Pursuant to Mass.R.Civ.P. 12(b)(6) and Defendant the Robeco Group N.V.’s Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(5) are DENIED.

 Robeco points out that the “Contacts” section of its website lists only a single address in Rotterdam for Robeco itself, along with addresses for its many subsidiaries, and that the only Massachusetts address that appears is the Boston office of RIM, also identified as Boston Partners.

Notably absent from the plaintiffs affidavit, as well as from the complaint, is anything that would indicate the relationship between the amount of funding placed by an investor and the amount of revenue Robeco and/or RIM would receive.

The full title of the Hague Service Convention is the “Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters,” Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638.