Roach, Christine M., J.
Following bench trial May 19 and 21, and June 4, 2008, and review of all testimony, exhibits, stipulations of the parties, and post-trial filings completed June 13, 2008, the court finds and rules as follows with respect to Plaintiffs remaining claims.

FINDINGS OF FACT

All of the below-enumerated Findings of Fact represent findings by the court, including but not limited to determinations of the credibility, weight, and probative value of the evidence adduced at trial and reasonable inferences drawn from that evidence.[1]
1. Defendant Data Plus, Inc. (“the Company”) was founded by Defendant A. Bruce Bensetler (“Mr. B.’j in 1973. The company is in the business of creating, selling and servicing software for use by the hospitality industry. Trial Exhibit 1; Trial Testimony of Plaintiff Patricia Bensetler (“Mrs. B.’j and Mr. B.
2. Mr. B. and Mrs. B. were married in 1966. They separated in December 1999, and were divorced August 29, 2002. Stipulated Facts; Trial Exhibit 29.
3. Mr. B. has always been President of the Company. The Company is small, at all relevant times having had no more than fifteen employees. It was and remains a “close” corporation, with a limited number of shareholders and a simple management structure. Mr. B. was the final decision maker for operations. Mrs. B. Trial Testimony; Mr. B. Trial Testimony.
4. The Board of Directors of the Company originally consisted of the founding principals; however Mrs. B. became a Director relatively early on. Mr. B. Trial Testimony; Stipulated Facts; Trial Exhibits 1, 8, 13.
5. Mrs. B. became a Director of the Company in 1980. Her title as of 1987 was Chief Financial Officer and Treasurer. Trial Exhibit 4. Over the years she also became a substantial shareholder, as a result of stock transfers made or approved by Mr. B. As of 1999, Mrs. B. held 9,379 shares, for a percentage ownership of 44.5%, identical to that of Mr. B. Others held the remaining 11%. Mrs. B. Trial Testimony; Mr. B. Trial Testimony; Trial Exhibit 17-1.
6. Mrs. B’s role in the company changed over the years. She was not originally involved with the Company, beyond holding a token amount of stock along with other spouses of principals. Eventually she began working for the Company in various financial functions. In or about 1987 she began drawing regular compensation in the form of salary plus bonus. As of October 1987 she was working “full time.” Trial Exhibits 4, 6, 16.
7. By the mid-to-late 1990s Mrs. B. did not continue to devote the equivalent of full-time effort and contribution to the Company. Nonetheless, the Company continued to pay her a significant salary, bonuses, and benefits. There was substantial evidence, discussed further below, that the work within Mrs. B’s alleged job description and assignments would not occupy a person of her education and experience anywhere near 40 hours per week, that other Company employees performed her work, and that she declined to perform work requested by Mr. B. Nonetheless, the Company continued to pay her as a full-time employee, in addition to her other compensation. Mr. B. Trial Testimony; Mary Ellen Smart Trial Testimony.
8. Specifically, in 1999, at the onset of the events giving rise to this lawsuit, Mrs. B. was collecting an annual base compensation of $85,000 for the following duties: providing financial statements to the Company’s bank (for a deposit relationship only); bi *629 weekly payroll; and vendor relations, including the landlord. Mrs. B. Trial Testimony; Mr. B. Trial Testimony.
9. Beginning at the latest in the year 1999, the strained personal relationship between the Bensetlers impacted their working relationship, and eventually the functioning of the Company. Examples abound in the evidence, but some of the more trenchant are as follows:
a. As early as 1989, Mrs. B. “unilaterally decided” that she was going to work from home in lieu of going to the Company’s then offices in Concord, Massachusetts. Mr. B. helped Mrs. B. to renovate a porch at their home in Bolton, Massachusetts, and this space was used by Mrs. B. as the financial office of the Company until her termination in August 2000. This location effectively isolated Mrs. B. from other employees of the Company, and limited her viewpoint on the Company. She rarely visited the Company offices in Concord (or later, Acton), and then only to have lunch with the Bensetlers’ daughter, Alissa, who also worked for the Company. Mr. B. Trial Testimony; Mrs. B. Trial Testimony; Mary Ellen Smart Trial Testimony.
b. Mrs. B. was responsible for obtaining and implementing a retirement program for the Company’s employees during the period 1999-2000. While the appropriate structure was created, the resulting 401k accounts were never actually funded, creating potential legal exposure for the Company. It was Mrs. B’s job to fund these accounts, which she failed to do for reasons unexplained. Mr. B. Trial Testimony; Mrs. B. Trial Testimony; Mary Ellen Smart Trial Testimony.
c. Mrs. B. was also responsible for the Company’s lease negotiations and ultimate move from Concord to Acton in 2000. This process did not go well for the Company. Its long-term landlord declined to renew its lease, and the move was plagued with problems, including interrupted telephone service, and the landlord’s refusal to work with Mrs. B. The Bensetlers’ daughter, Alissa, replaced Mrs. B. as manager of the move. Mr. B. Trial Testimony.
d. In a peculiar — and damning — coup de grace, Mrs. B. decided unilaterally to give herself a salary increase in 2000, without benefit of President Mr. B’s agreement, or any notification to Mr. B. or the other directors and shareholders. The record is undisputed that beginning January 2000, Mrs. B. raised her own base salary from $85,000 peryearto $100,000 peryear. Mr. B. Trial Testimony; Trial Exhibits 16-1, 49.
e. Also in the spring of 2000, Mrs. B. unilaterally declared and paid herself a dividend, although this was not discovered until following her termination from employment, and no other dividends were distributed that year. Mr. B. Trial Testimony; Trial Exhibits 40-5, 40-8, 40-9, 46-1.
10. Despite the deterioration of the Bensetlers’ communications, the Company was doing well through December 1999, as a result of its ability to leverage the “Y2K” issues and concerns of its customers. The Company’s fiscal year ended May 31, and its revenues steadily increased from 1997 through 2000. However, following January 1, 2000, revenues began to drop significantly. By May 2001, revenue was only about 60% of that in 2000. Mr. B. Trial Testimony; Trial Exhibits 41-6.
11. There is evidence that both Bensetlers began to be concerned about the Company’s finances, albeit each from his and her quite separate perspectives. Mr. B. was worried about attracting and keeping new business, that is, building revenue and decreasing expenses. Mrs. B. was concerned “about cash flow,” that is, meeting payroll and paying taxes. See for example, Trial Exhibits 49 and 50.
12. By May 2000 the Bensetlers’ perspectives were separated literally, as well as figuratively. Mr. B. had moved out of the marital home in December 1999. He believed he was unwelcome at the porch financial office, and thus did not attempt to visit there. Instead he regularly asked Mrs. B. for information about banking records and expenses, which she usually declined to provide. Mrs. B., in turn, was isolated from the revenue information, as she was not responsible for maintaining sales records, and could only have access to them if she went to the Company office. (For reasons historical and not entirely clear, the Company’s financial records were apparently kept on several different software systems, loaded on separate hard drives.) Thus, each of the Bensetlers was viewing only half the balance sheet, while the other half was maintained in the custody of the estranged spouse. Mr. B. Trial Testimony; Mrs. B. Trial Testimony; Mary Ellen Smart Trial Testimony.
13. In or about July 2000, Mr. B. decided this situation was no longer tenable, and sought legal advice regarding separating his wife from the Company. What followed was a series of not particularly elegant moves and missteps, which may be summarized as follows:
a. A Special Meeting of Stockholders was held at law offices on August 10, 2000. At that meeting, the present stockholders voted to elect a third Director, John Dacey, in addition to Mr. and Mrs. B. Mr. Dacey was an employee and shareholder of the Company and fairly characterized as an ally of Mr. B. Although she had not received the mailed formal notice of the Special Meeting of Stockholders, Mrs. B’s daughter informed her of the meeting prior to its taking place. Mrs. B. chose not to attend this Special Meeting of Stockholders. Mr. B. Trial Testimony; Mrs. B. Trial Testimony; Trial Exhibit 22.
b. Immediately following the Special Meeting of Stockholders, a joint meeting of the (newly-formulated) Directors and stockholders was held. At that meeting, Mr. B. presented his case described in further detail below — for termination of Mrs. B’s employment *630 with the Company. The Board (Mr. B. and Mr. Dacey) voted to do so, and to authorize Mr. B. to negotiate the details of a severance arrangement. Trial Exhibits 21 and 22.
c. There is no evidence of any form of advance notice to Mrs. B. of the Director’s meeting. Mr. B. Trial Testimony; Mrs. B. Trial Testimony; Attorney Vacovec Trial Testimony.
14. It is now undisputed that the Special Meeting of Stockholders was not properly called, because Mr. B. and his advisors were mistaken about the status of record of the Company’s stock, and there was no quorum at the meeting. I find that this particular misinformation was an inadvertent mistake, and not an effort to prejudice Mrs. B’s stock interests or otherwise wrongfully harm her. Trial Exhibit 2, at Art. 1, Sections 3-5.
15. The failure to notify Mrs. B. of the subsequent Director’s meeting, on the other hand, was an intentional — and successful — attempt to exclude her from the deliberations on her termination, and was also a statutory violation. Mrs. B’s choice not to attend the Special Meeting of Stockholders cannot be deemed a choice not to attend a directors meeting she knew nothing about. G.L.c. 156B section 56 (“special meetings of the directors shall be held only upon notice to the directors”); Trial Exhibit at Art. II, Sec. 3.
16. August 10, 2000 was the same day Mr. B. filed for divorce. Testimony of Mr. B.
17. The Directors’ vote of August 10, 2000 with respect to Mrs. B’s employment directed Mr. B. as President to “use his best efforts to negotiate a severance arrangement with Ms. B. and in the interim to continue to compensate her at her base compensation and benefits ... as of December 3, 1999 until such time as a settlement of all issues attending to her separation from the Company can be achieved.” Trial Exhibits 21-3, 22-9, 23.
18. However, within a matter of days, the severance proposal was abandoned by Mr. B. Based on Mrs. B.’s response to the series of events, including the intervention of her divorce counsel, Mr. B. determined on behalf of the Company that an ongoing severance arrangement was untenable. Mrs. B. offered no evidence to rebut this particular determination by Mr. B., or to suggest that the Board’s documented willingness to pay her severance was in any way insincere or a sham at the time'of the vote on August 10, 2000.
19. Mrs. B. was terminated from employment with the Company effective August 31, 2000. No one was hired by the Company to replace her. Her duties were assumed by Mr. B. and Maiy Ellen Smart. Mr. B. Trial Testimony; Mary Ellen Smart Trial Testimony.
20. Mrs. B. did not work from September 2000 through September 2001 either full- or part-time for any appreciable wage income. There was no evidence she actively sought substitute employment. Trial Testimony of Mrs. B.; Trial Testimony of Mr. B.; Trial Exhibit 44-1.
21. In October 2001 the Company held its Annual Shareholders Meeting and also a Directors Meeting. Mrs. B. attended both. The shareholders voted new Directors, again excluding Mrs. B. The new Directors ratified by vote all prior Company acts, which ratification was intended to include the votes taken in August 2000 with respect to Mrs. B. Trial Testimony of Mr. B.; Trial Testimony of Attorney Vacovec; Trial Exhibits 47 and 48.
22. Ownership issues with respect to the Company were resolved by the Probate Court in the context of the parties’ divorce litigation. Plaintiff has stipulated that the Complaint in this action seeks damages in the form of one year’s employment compensation only, from September 2000 to September 2001. Trial Exhibit 29.

LEGAL STANDARDS

1. A corporation is considered closely-held when there are a small, limited number of shareholders, no ready market for the stock, and substantial majority stockholder participation in the management, direction and operation of the corporation. Shareholders in such a closely-held corporation owe one another a fiduciary duty to act with utmost good faith and loyalty towards one another. They may not act out of avarice, expediency or self-interest in derogation of this duty to one another, or their duty to the corporation. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 585-97 (1975); Vakil v. Anesthesiology Associates of Taunton, Inc., 51 Mass.App.Ct. 114, 118 (2001).
2. Even in close corporations, however, the majority interest must have a large measure of discretion in among other things, declaring or withholding dividends, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees. The controlling group must have some room to maneuver in establishing the business policy of the corporation, and thus must be given the opportunity to demonstrate a legitimate business purpose for its actions. Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 851 (1976).
3. Principles of employment law permit the termination of employees at will, with or without cause, excepting situations within a narrow public policy exception. Merola v. Exergen Corp., 423 Mass. 461, 464 (1996), citing King v. Driscoll, 418 Mass. 576, 581-82 (1994). Employees of closely held corporations who do not meet reasonable standards of employment or are disruptive to business may be terminated. Demoulas v. Demoulas Super Markets, Inc., 33 Mass.App.Ct. 939-40 (1992).
4. The termination of a minority shareholder’s employment may present a breach of fiduciary duty where such a shareholder depends on her salary as *631 the principal return on her investment in the company, if the other shareholders do not demonstrate a legitimate business purpose for the termination. Merola, 423 Mass. at 464-65.
5.This is because certain such employees enjoy a legal presumption that they hold “a rightful expectation of employment,” when, for example, employment is conditioned on stock ownership. The lynchpin to all freeze-out analysis is reasonable expectations. Brodie v. Jordan, 447 Mass. 866, 868-70 (2006). Nonetheless, management of a closely-held corporation may take action against an employee who is also a fiduciary when it has good faith reason to believe she is disruptive to the business or engaging in self-serving conduct, and thus there is cause for terminating the employment. Demoulas, 33 Mass.App.Ct. at 939-40. When there is no evidence that the majority stockholders acted out of a desire to increase their financial gain in the corporation, there is no “freeze out” or breach of fiduciary duty. Vakil, 51 Mass.App.Ct. at 118-19.

RULINGS

1. Mr. B. intended in August 2000 to exclude Mrs. B. from the Company.
2. Certain of the reasons Mr. B. gave in August 2000 for excluding Mrs. B. from the Company were extremely dated and of long standing (for example, Trial Exhibit 46-1, Items 1 and 9), not well documented (Items 2, 7, 10), or not sufficiently serious, singly or together, to justify a “freeze out” of one shareholder by another from a closely held corporation. The court thus does not credit or include them as a basis of its Rulings.
3. Mr. B. essentially created, in August 2000, a “kitchen sink” list of accumulated professional grievances with his wife’s performance within the Company over a ten-year period. Nonetheless, certain of those grievances were and are sufficiently serious to justify Mrs. B’s termination, in particular, Mrs. B’s failures and/or inaction in the period surrounding the move of the Company in March 2000 (Items 3-6), and her unilaterally paying herself both a salary increase and a dividend in 2000 (Items 8 and 10), without approval of the President and/or the Board, each constitutes an objective and reasonable basis for termination.
4. By the mid-90s Mr. B. had adopted an “appeasement strategy” to deal with the fact that, as a result of his troubled marriage, his estranged wife was using passive-aggressive means to maintain her influence within, and income from, the Company. Mr. B. Trial Testimony.
5. This failed appeasement strategy did not constitute a waiver of Mr. B’s authority as President to take action against a disloyal employee for the best interests of the Company. Mr. B. retained his authority, pursuant to the By-Laws of the Company, to manage employees, including Mrs. B, in the best interest of the Company, providing he did so in good faith. Trial Exhibit 2, at Art. Ill, Section 2.
6. Mr. B.’s failed strategy does not provide evidence of bad faith. Rather, the court finds the delays and missteps evidence an unfortunate but genuine inability to face a failing marriage, and the inevitable impact it would have on both parties’ financial interests in general, and the Company in particular.
7. At no time during the years 1999-2000 did Mrs. B. perform work for the Company worth anywhere near the more than $100,000 she had decided to pay herself.
8. Maintaining a disgruntled, non-contributing, and self-serving employee such as Mrs. B. on the Company’s payroll was not in the Company’s best interest. By August 2000, there was no effective alternative course of action less harmful to Mrs. B. that could have been taken, and Mrs. B. offered none — then or at trial.
9. The equity issues often of concern in closely-held corporations are not controlling here, because Mrs. B. was not a minority shareholder vis-a-vis Mr. B., the parties fully litigated and resolved the value of Data Plus, and Mrs. B’s appropriate share of that value, through their divorce proceeding in the Probate Court.
10. The court finds Mrs. B. believed herself entitled to realize a portion of her investment in the Company through an annual salary. However, Mrs. B. was not entitled to that salary as a matter of law, once her actions were no longer in the best interest of the Company as a whole. The weight of the evidence is that Mrs. B. was an at-will employee in 2000. To the extent any defacto contract of employment existed between Mrs. B. and the Company, Mrs. B. materially breached that contract by her actions in 1999 and 2000. Thus Mrs. B. is not entitled to judgment on her contract claim in Count II of the Complaint.
11. At some point prior to December 1999, the parties allowed their marital troubles to color their professional work and behavior. While I find this was a mutual failing, Mrs. B. stepped over the line, and lost any equitable ground she may otherwise have occupied, when she ignored the critical fact that her husband was the boss of the Company for purposes of her employment. She knowingly acted at her peril.
12. Mrs. B. was lawfully terminated, and thus is not entitled to recoup any salary from the Company for the period August 2000 through August 2001, and not entitled to judgment on Count I of her Complaint.
13. Because Mr. B. as President possessed the legal authority to terminate Mrs. B’s employment with the Company, the court need not and does not reach the question of attempted ratification of the August 2000 directors’ meeting and vote.
14. Although Defendants committed a violation of Chapter 156B by failing to give advance notice of the August 10, 2000 meeting of directors, that violation *632 was not the proximate cause of any harm to Mrs. B., and, thus failing on a critical element, Mrs. B. is not entitled to judgment on Count V of the Complaint.
Conclusion
Judgment shall enter in favor of Defendants on Counts I, II and V of the Complaint, and this matter shall be DISMISSED WITH PREJUDICE.

 Prior to trial pursuant to Defendants’ unopposed Motion in Limine, Counts III, IV, VI and VII of the Complaint were dismissed with prejudice. See Order dated May 19, 2008. Counts I (unlawful termination), II (breach of contract), and V (violation of Chapter 156B) were tried.