NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-172

VINCENT ANTHONY POLITO, JR.

vs.

SHIRE PHARMACEUTICALS & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Vincent Anthony Polito, Jr., appeals from the entry of summary judgment in favor of his former employer, Shire Pharmaceuticals (Shire), on his claims for wrongful termination in violation of public policy, intentional interference with advantageous business relations, and breach of implied contract. On appeal, Polito contends that the judge erred in allowing Shire's motion for summary judgment on his wrongful termination claim.[2] We affirm.

---

[1] Shire Pharmaceuticals, LLC, Shire US Inc., Mark Broome, Walter Mullikin, Jeffrey Rosenbaum, Christopher Allen, Jamie Spaeth, Wes Graham, and Wil Tilton. None of the individual defendants is part of this appeal.

[2] On appeal Polito does not address the claims for intentional interference with advantageous business relations or breach of implied contract. Rather, he contends that if he prevails on his wrongful termination claim, he should likewise prevail on the other claims, but if he is unsuccessful on the

Background.  We summarize the relevant material facts from the summary judgment record, viewed in the light most favorable to Polito, the nonmoving party.  See Juliano v. Simpson, 461 Mass. 527, 529 (2012).

On or about June 27, 2014, Shire hired Polito as a data scientist.  Polito was an at-will employee.  In August 2014, Polito began working on a project at Shire to achieve compliance with the Drug Enforcement Agency's (DEA) suspicious order monitoring (SOM) regulations for certain controlled substances (SOM project).  The SOM project involved developing a "predictive modeling system" that would enable Shire to monitor potentially suspicious prescription orders.  The SOM project consisted of two phases:  phase one analyzed data related to Shire's major distributors, and phase two analyzed data related to its smaller distributors.

On November 18, 2014, Polito submitted drafts of a report and presentation slides related to the SOM project to his supervisor Walter Mullikin and the project's leader Wes Graham.  In his slides, Polito asserted that "Shire is not compliant" with the DEA's data and information reporting expectations

---

wrongful termination claim, then the remaining claims fail as well.  We therefore do not consider them.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019) ("The appellate court need not pass upon questions or issues not argued in the brief").

related to potentially suspicious orders of controlled substances.  Mullikin and Graham revised the report to state that "Shire is not fully compliant" with the DEA's expectations.

In April 2015, Polito visited a Shire distribution center and encountered issues with the data that was used in the phase one analysis.  Polito submitted a summary of those data issues (SOM allegations) to Mullikin and Graham in June of 2015.  In July 2015, Mullikin presented Polito's summary to the SOM project steering committee.  Following the presentation, the steering committee decided to stop the SOM project, and Polito subsequently resigned from the committee in August 2015.[3]

By the fall of 2015, Mullikin had become concerned about Polito's job performance.  On November 6, 2015, Polito and Mullikin met regarding Polito's performance.  Shortly after, Mullikin sent an e-mail message to Polito stating that Polito had exhibited a "pattern of disengagement over the past several months with a weak pipeline of projects," gave him a list of action items, and requested that Polito provide weekly status reports and meetings to discuss his progress.  Polito responded via e-mail message that he "disagree[d] with [Mullikin's] false allegations and unsupported troubling statements," and accused Mullikin of failing to support him after he raised his SOM

---

[3] Shire eventually contracted with an external vendor for services related to SOM compliance.

allegations.  Over the next few months, Mullikin "communicated his concerns regarding Polito's job performance, attendance issues, disengagement with his work, and insubordination" to human resources professionals within Shire, who "coached Mullikin on how to communicate with Polito."

In early January 2016, Shire's chief compliance officer, Jeffrey Rosenbaum, asked to meet with Mullikin to discuss Shire's internal data analytics capabilities.  When Polito informed Mullikin that he intended to discuss his SOM allegations at the meeting, Mullikin told him that he did "not want to go there."  On January 13, 2016, Polito mentioned his SOM allegations to Shire's head counsel, Christopher Allen.  On January 14, 2016, and again on January 19, 2016, Polito met with Rosenbaum regarding his SOM allegations and his concerns about his management team.  Rosenbaum subsequently relayed Polito's allegations and concerns to Allen, who commenced an investigation.

As Shire began its investigation, Polito continued to have issues with his managers and other employees at Shire.  In February 2016, Polito, Mullikin, and Mullikin's supervisor, Mark Broome, had a telephonic meeting to discuss the "goals of the business, IT and Enterprise Data Analytics for 2016."  Mullikin sent an e-mail message to Polito to schedule a follow-up meeting to review Polito's performance objectives.  Polito responded

4

that Mullikin's e-mail message had misrepresented the facts of their meeting and that Mullikin was trying to "create a false record so that [he could] develop a false narrative to terminate [him]."  Polito then requested that all future communications with Mullikin and Broome be recorded or in writing.  Mullikin and Broome did not agree to his request to record meetings, and thus their subsequent communications with Polito occurred via e-mail.  They did not have any meetings with him to discuss his progress.  In February 2016, Polito communicated with Jamie Spaeth, a member of Shire's human resources department, regarding sick time, working from home, and issues with his management team, but he refused to speak with Spaeth on the phone and "requested that all communications be over email."  At one point, Mullikin noted that Polito did not attend an "important meeting" and that he "appeared to have blocked every hour of every day since [February 29, 2016]" on his work calendar to "mak[e] it appear that [he was] unavailable."

On February 26, 2016, Rosenbaum sent an e-mail message to Polito and asked him to meet with Shire's lawyers as part of the investigation into his SOM allegations and the "HR concerns." Polito informed Allen that he was represented by counsel. Beginning on March 9, 2016, Allen had numerous exchanges with Polito's counsel to try to schedule an interview with Polito regarding the SOM allegations and his concerns about his

management team.  On April 8, 2016, Allen informed Polito's counsel that Shire had decided to place Polito on a paid leave of absence.  Efforts to schedule an interview with Polito continued in April and May of 2016.  Polito's counsel "ignor[ed] Allen's numerous attempts for an interview with Polito," did not provide Shire with Polito's availability to interview, and claimed that there was "no urgency" to the investigation.  By June 2016, Shire's outside counsel took over the effort to schedule an interview with Polito.  An interview was eventually scheduled for July 28, 2016, but Polito's counsel canceled it the day before it was scheduled to take place.[4]  Subsequent attempts to reschedule were unsuccessful, and on August 16, 2016, Polito's counsel was informed that Polito's employment would be terminated if he did not sit for an interview on or before September 2, 2016.  Polito's counsel wrote back, claiming that he was "away" and would be returning on September 5, 2016.

Meanwhile, on or about June 14, 2016, Kelly Boucher, Shire's vice president and head of human resources, reviewed documents related to Polito's job performance and his interactions with his managers.  Based on her review, she decided to terminate Polito's employment.  Shire did not

---

[4] Polito's counsel advised that he had to cancel the meeting due to his father's failing health.  Shire's counsel expressed his condolences and asked Polito's counsel to contact him to discuss rescheduling the interview.

immediately execute that decision due to their ongoing efforts to interview Polito about his SOM allegations and his issues with his managers.

On August 24, 2016, Shire informed Polito by letter, conveyed through counsel, that his employment was terminated due to "the increasingly antagonistic and unprofessional nature of Polito's communications and relationship with his managers that created a non-productive work environment that could no longer be tolerated" and his "refusal to appear for an interview" in relation to Shire's investigation.  That same day, Polito attended an interview at the United States Attorney's office to report his "public health concerns."

Discussion.  We review a grant of summary judgment de novo to determine whether, "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law" (citation omitted).  Casseus v. Eastern Bus Co., 478 Mass. 786, 792 (2018).  See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002).  See also Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

"As an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, we have recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates

7

a clearly established public policy." Barbuto v. Advantage Sales & Mktg., LLC, 477 Mass. 456, 471 (2017), quoting King v. Driscoll, 418 Mass. 576, 582 (1994), S.C., 424 Mass. 1 (1996). "[T]he public policy exception to at-will employment has been recognized 'for asserting a legally guaranteed right (e.g., filing a worker's compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).'" Meehan v. Medical Info. Tech., Inc., 488 Mass. 730, 733 (2021), quoting Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149-150 (1989). The law recognizes a fourth category to the exception, for "performing important public deeds, even though the law does not absolutely require the performance of such a deed." Meehan, supra, quoting Flesner v. Technical Communications Corp., 410 Mass. 805, 810-811 (1991).

To prevail on a claim for wrongful termination in violation of public policy, an at-will employee must prove that he engaged in conduct covered by a well-established public policy and that his employment was terminated "for a reason contrary to a well-established public policy." Shea v. Emmanuel College, 425 Mass. 761, 764 (1997). See Mello v. Stop & Shop Cos., 402 Mass. 555, 560-561 (1988). Where an employee relies on indirect or circumstantial evidence of the causal connection between the

8

protected activity and the adverse employment action, he may survive summary judgment using a three-part burden-shifting framework similar to the one articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973) (McDonnell Douglas).[5]  See Mole v. University of Mass., 442 Mass. 582, 591-592 (2004).  At the first stage, the plaintiff has the burden of producing evidence "that he engaged in protected conduct, that he suffered some adverse action, and that 'a causal connection existed between the protected conduct and the adverse action'" (citation omitted).  Mole, supra.  At the second stage, the employer must articulate a nonretaliatory reason for the adverse action.  See id. at 591.  If the employer meets this burden, the plaintiff has the burden of proving that the articulated nonretaliatory reasons were pretextual.  See id.

The first stage can in some circumstances be satisfied by a showing of close temporal proximity between the employee's protected conduct and the employer's adverse employment action.

---

[5] The framework is often utilized in evaluating retaliation claims where the plaintiff lacks direct evidence of a wrongful motive.  See, e.g., Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., 474 Mass. 382, 406 (2016).  Polito does not have a retaliation claim at issue on appeal, but rather a claim for wrongful termination in violation of public policy relying on circumstantial evidence to establish a causal connection between his alleged whistleblowing and his termination.  The parties agree that the framework articulated in McDonnell Douglas and Mole, as applied by the motion judge, is the proper test to use to determine whether Polito's claims can survive summary judgment.

See Mole, 442 Mass. at 592-593. When "adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity, an inference of causation is permissible." Id. at 592. The adverse action, however, must "follow close on the heels of protected activity" for a causal relationship to be inferred, otherwise the plaintiff must rely on "additional evidence beyond temporal proximity to establish causation" (citation omitted). Id. at 595 (termination must be "very closely connected in time to the protected activity" for inference to survive [citation omitted]). See id. at 592, quoting Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992) ("That an employer knows of a discrimination claim and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation. 'Were the rule otherwise, then a disgruntled employee . . . could effectively inhibit a well-deserved discharged by merely [engaging in protected activity]'").

Polito argues that he satisfied his burden to establish a "causal connection" because before raising his SOM allegations, he was a "valued employee," and subsequent to his whistleblowing, he "suffered immediate direct adverse actions" that concluded with his termination. We are not persuaded.

10

At the first stage, Polito cannot satisfy his burden by relying on the fact that his termination occurred after he raised his SOM allegations.  Polito's termination in August 2016 occurred over one year after he brought his SOM allegations to Mullikin and over six months after he reported the SOM allegations to Allen and Rosenbaum.  Polito's termination was not in the "immediate aftermath" of his whistleblowing and thus a causal connection between the events cannot be established by temporal proximity.  Mole, 442 Mass. at 592.  See id. at 595 ("as the elapsed time between those two events becomes greater, the inference weakens and eventually collapses").  See also Dube v. Middlesex Corp., 59 Mass. App. Ct. 734, 741 n.3 (2003) ("one event following another is not, by itself, sufficient evidence of causality to establish a prima facie case of unlawful retaliation, particularly where, as here, the two events are separated by months, not days").

Polito also argues that he satisfied his burden because his employment was terminated "a few hours after [he] whistleblew" to the United States Attorney's office.  There is no evidence in the record that Shire was aware of when Polito intended to bring his SOM allegations to the United States government.  Moreover, Polito does not dispute that the decision to terminate Polito, while not executed until August 24, 2016, was made at least one month before he went to the United States Attorney's office.

Indeed, Polito does not dispute that Boucher made the decision to terminate Polito in June 2016.  Further, it is undisputed that "Shire did not immediately execute Boucher's decision to terminate Polito's employment because Shire still wanted to interview Polito about his allegations regarding Shire's SOM program and his HR issues."  See Mole, 442 Mass. at 594 ("Where . . . adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions . . . are motivated by retaliation").[6]

Polito thus did not provide any evidence sufficient to create a genuine factual dispute whether the "adverse actions" he experienced were because of his whistleblowing.  See Shea, 425 Mass. at 763-764 ("An assertion or speculation that the [employer] discharged [the employee] for that reason is not sufficient to create a genuine dispute of material fact concerning the reason for [his] discharge").  On the other hand, there is ample evidence that Shire terminated Polito for

---

[6] We note that Shire spent more than six months trying to schedule this interview with Polito's counsel, but was unsuccessful due to delays and refusals on the part of Polito and his counsel.  Shire terminated Polito on August 24, 2016, only after his counsel rejected a clear ultimatum that Polito would be terminated if he did not appear for an interview by September 2, 2016.

nonretaliatory reasons and not for his whistleblowing.  Boucher

provided Shire's reasons for Polito's termination in the letter

that was also provided to his counsel:

> "In April you were placed on a paid leave of absence as a
> result of the increasingly antagonistic and unprofessional
> nature of your communications and relationship with your
> managers that created a non-productive work environment
> that could no longer be tolerated.  That environment
> ultimately mandated the termination of your employment.

> "In addition . . . [Shire] tried on numerous occasions to
> schedule an interview with you regarding certain issues you
> had raised.  Despite the fact you remained an employee of
> [Shire], you have not submitted to the requested
> interview."

The record demonstrates that between October 2015 -- months

after Polito first raised his SOM allegations -- and his

termination in August 2016, Polito had attendance issues; was

absent from an "important meeting"; dismissed his supervisor's

concerns about his job performance and did not provide

substantive performance objectives; blocked off "every hour" of

his calendar to make it appear that he was unavailable; refused

to speak with his managers or other Shire employees over the

phone when they declined to be recorded; was unprofessional in

his e-mail messages and communications with his managers and

other Shire employees; and was uncooperative with Shire's

attempts to interview him and address his SOM allegations and

concerns about his managers.  On this record, Polito cannot show

that Shire terminated him because of his alleged whistleblowing.

13

See Shea, 425 Mass. at 763-764.  Given the series of issues with Polito's performance and professionalism, Polito's claim thus fails a matter of law for lack of adequate proof of causation.  See Mello, 402 Mass. at 558, 561 (employee failed to prove that employer would not have discharged him but for conduct protected by public policy).  Accordingly, we discern no error in the allowance of summary judgment.

Judgment affirmed.

By the Court (Massing,
  Neyman & Wood, JJ.[7]),

Clerk

Entered:  July 7, 2025.

---

[7] The panelists are listed in order of seniority.